**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 13-5158**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

UPMC BRADDOCK, UPMC McKEESPORT,
and UPMC SOUTHSIDE,

Appellants,

v.

THOMAS E. PEREZ, in his official capacity as
Secretary of the United States Department of Labor; UNITED STATES
DEPARTMENT OF LABOR; TRACIE C. BROWN, in her official capacity as
District Director, United States Department of Labor ESA-OFCCP; and
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS,

Appellees.

---

Appeal from the United States District Court for the District of Columbia,
No. 09-1210, Judge Paul L. Friedman

---

**BRIEF FOR APPELLANTS**

---

John J. Myers
Ryan J. Siciliano
ECKERT SEAMANS CHERIN & MELLOT, LLC
US Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219-2788
412 566-6000
jmyers@eckertseamans.com

Peter Buscemi
William E. Doyle, Jr.
David M. Kerr
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
202 739-5190
pbuscemi@morganlewis.com

D'Andra Millsap Shu
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4000
Houston, Texas 77002
713 890-5000

***Attorneys for Appellants***

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

The following is a list of all parties and their respective counsel who appeared in the District Court and before this Court:

### 1.    Plaintiffs-Appellants:

UPMC Braddock, UPMC McKeesport, and UPMC Southside (collectively, the "Hospitals").

Corporate Disclosure Statement (pursuant to Circuit Rule 26.1):  The Hospitals are non-stock, non-profit corporations that have no subsidiaries or affiliates that have issued shares or debt securities to the public.  The Hospitals' parent company is UPMC, which has issued debt securities to the public.  The Hospitals provide (or provided at the time relevant to this case) in- and out-patient medical services in and around the Pittsburgh, Pennsylvania area.

### 2.    Counsel for Plaintiffs-Appellants:

Peter Buscemi
William E. Doyle, Jr.
David M. Kerr
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T.  202.739.3000
F.  202.739.3001
E-mail:   pbuscemi@morganlewis.com
          wdoyle@morganlewis.com
          dkerr@morganlewis.com

D'Andra Millsap Shu
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana
Suite 4000

i

Houston, Texas 77002
T.  713.890.5000
F.  713.890.5001
E-mail:   dshu@morganlewis.com

John J. Myers
Ryan J. Siciliano
ECKERT SEAMANS CHERIN & MELLOT, LLC
US Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219-2788
T.  412.566.6000
F.  412.566.6099
Email:    jmyers@eckertseamans.com
             rsiciliano@eckertseamans.com

Jeffrey W. Larroca
ECKERT SEAMANS CHERIN & MELLOT, LLC
1717 Pennsylvania Avenue, N.W.
Suite 1200
Washington, D.C. 20006
T.  202.659.6646
F.  202.659.6699
Email:    jlarroca@eckertseamans.com


Constantinos G. Panagopoulos
BALLARD SPAHR LLP
1909 K Street, N.W.
12th Floor
Washington, D.C. 20006
T.  202.661.2202
F.  202.661.2299
Email:    cgp@ballardspahr.com

3.     **Defendants-Appellees:**

Thomas E. Perez, in his official capacity as Secretary of the United States Department of Labor[*]

Seth D. Harris, in his official capacity as Acting Secretary of the United States Department of Labor

Hilda L. Solis, in her official capacity as Secretary of the United States Department of Labor

United States Department of Labor

Tracie C. Brown, in her official capacity as District Director of the United States Department of Labor's OFCCP[**]

Mary Ann Sedlacek, in her official capacity as District Director of the United States Department of Labor's OFCCP

Patricia Shiu, in her official capacity as Director of the United States Department of Labor's OFCCP

Office of Federal Contract Compliance Programs

4.     **Counsel for Defendants-Appellees:**

Michael Jay Singer
Sushma Soni
Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Room 7218
Washington, D.C. 20530

---

[*] Thomas E. Perez automatically substituted for Seth D. Brown, who in turn substituted for Hilda L. Solis, as a party pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[**] Tracie C. Brown automatically substituted for Mary Ann Sedlacek as a party pursuant to Federal Rule of Appellate Procedure 43(c)(2).

T.  202.514.4331
E-mail:  michael.singer@usdoj.gov
          sushma.soni@usdoj.gov

Lily Sara Farel
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, N.W.
Suite 6107
Washington, DC 20001
T.  202.353.7633
E-mail:  lily.farel@usdoj.gov

Tony West
Assistant Attorney General
Joseph W. Lobue
Assistant Director, Federal Programs Branch
Steven Y. Bressler
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
T.  202.305.0167
F.  202.616.8470
E-mail:  steven.bressler@usdoj.gov

Ronald C. Machen, Jr.
United States Attorney
David Cotter Rybicki
U.S. ATTORNEY'S OFFICE
555 4th Street, N.W.
Washington, D.C. 20530
T.  202.353.4024
E-mail:  david.rybicki@usdoj.gov

Katherine E. Bissell
Associate Solicitor of Labor
Beverly Dankowitz
Counsel for Litigation
Theresa Schneider Fromm
Senior Trial Attorney
United States Department of Labor

iv

Office of the Solicitor
200 Constitution Ave., N.W.
Room N-2474
Washington, DC  20210

## B. Rulings Under Review

The rulings under review in this appeal are the Administrative Review

Board's May 29, 2009 Final Decision and Order (JA 49, *In re UPMC Braddock*,

ARB Case No. 08-048, 2009 WL 1542298, at *1 (DOL Adm. Rev. Bd. May 29,

2009)) and the district court's March 30, 2013 Order, (*UPMC Braddock v. Harris*,

Civil Action No. 09-1210 (PLF) (D.D.C.) (JA 47, ECF No. 25)), and Opinion

(*UPMC Braddock v. Harris*, Civil Action No. 09-1210 (PLF), ___ F. Supp. 2d __,

2013 WL 1290939, at *1 (D.D.C. Mar. 30, 2013) (Judge Paul L. Friedman) (JA 9,

ECF No. 26)) granting defendants' motion for summary judgment and denying

plaintiffs' motion for summary judgment.

## C. Related Cases

This case has not been previously under review in this Court or any other

court.

# TABLE OF CONTENTS

**Page**

Certificate As To Parties, Rulings, And Related Cases ............................................i

Glossary............................................................................................. xvii

Preliminary Statement ..........................................................................1

Jurisdictional Statement .......................................................................5

Issues Presented ..................................................................................5

Pertinent Statutes And Regulations .........................................................6

Factual And Procedural Background ........................................................7

     A.    The Contractual Relationships At Issue.....................................7

     B.    OFCCP Seeks To Subject The Hospitals To The Federal
          Subcontractor Affirmative Action Scheme...............................8

     C.    The Hospitals Already Are Subject To Federal, State,
          And Local Anti-Discrimination Laws That Prohibit The
          Same Discriminatory Practices As Executive Order
          11246...........................................................................11

     D.    The Affirmative Action Scheme Is Highly Demanding
          And Goes Far Beyond Prohibiting Unlawful
          Discrimination...............................................................12

          1.    OFCCP Requires Annual Affirmative Action
               Programs .................................................................13

          2.    OFCCP Conducts Complex, Highly Technical
               Compliance Reviews ..................................................16

Standard Of Appellate Review ..............................................................20

Summary Of The Argument .................................................................21

Argument..........................................................................................23

    I.    The Hospitals Are Not Subject To OFCCP's Affirmative
        Action Program And The Accompanying Highly Technical
        Compliance Regime ..........................................................23

     A.    OPM Has Authority To Issue Regulations For The
          FEHBP .........................................................................23

## TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| B. | OPM's Regulation Exempts The Hospitals From Subcontractor Status | | 25 |
| C. | Even If Not Excluded Altogether, The Hospitals Are Not Subcontractors Because Their Contracts Are Not Necessary To The Performance Of The Plan/OPM Contract | | 29 |
| D. | OFCCP's Attempts At Overreaching Its Authority And Regulating FEHBP Healthcare Providers Should Be Rejected | | 35 |
| II. | OFCCP Lacks Statutory Authority To Subject The Hospitals To The Affirmative Action Scheme Regarding Women And Minorities | | 38 |
| | A. | Congress Has Not Directly Authorized OFCCP's Affirmative Action Regulations Regarding Women And Minorities | 39 |
| | B. | Neither Title VII Nor The Property Act Provides Implicit Authority For The OFCCP Affirmative Action Scheme For Women And Minorities | 40 |
| | | 1. DOL's Implicit Authority Arguments Are Not Entitled To Deference | 41 |
| | | 2. Basic Principles Of Statutory Construction Militate Against Any Implicit Statutory Authority Arguments | 43 |
| | | 3. Title VII Does Not Implicitly Authorize OFCCP's Affirmative Action Scheme | 44 |
| | | 4. The Property Act Does Not Authorize The Affirmative Action Scheme | 45 |
| | |    a. The Property Act's Reference To Sex Discrimination Does Not Authorize OFCCP's Affirmative Action Scheme | 46 |

## TABLE OF CONTENTS
### (continued)

**Page**

    b.    There Is No Record Evidence Of A Reasonably Close Nexus Between OFCCP's Affirmative Action Scheme And The Property Act's Purpose Of Economy And Efficiency In Procurement ...................50

    c.    Implicit Authorization Of OFCCP's Affirmative Action Scheme Mandates An Interpretation Of The Property Act That Raises Serious Constitutional Problems .............53

Conclusion ...............................................................................57

Certificate Of Compliance ......................................................59

Certificate Of Service...............................................................60

Addendum

    I.    Executive Order 11246......................................................Add. 1

    II.    Section 503 of the Rehabilitation Act, 29 U.S.C. § 793 .........................................................Add. 13

    III.    Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 4212 .............................................................Add. 14

    IV.    OPM Subcontractor Definition, 48 C.F.R. § 1602.170-15 ........................................Add. 17

    V.    FAR Subcontractor Definition, 48 C.F.R. § 22.801 ...................................................Add. 17

    VI.    Executive Order 11246 Regulation Subcontractor Definition, 41 C.F.R. § 60-1.3 .......................................................Add. 17

    VII.    VEVRAA Regulation Subcontractor Definition, 41 C.F.R. §60-250.2(*l*) ...............................................Add. 18

    VIII.    Rehabilitation Act Regulation Subcontractor Definition, 41 C.F.R. § 60-741.2(*l*) .............................................Add. 18

    IX.    Title VII, 42 U.S.C. § 2000e-2(j)...............................Add. 18

    X.    Property Act, 40 U.S.C. §§ 101, 121, 122 ................Add. 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)......................................................55, 56, 57

*AFL-CIO v. Kahn*,
618 F.2d 784 (D.C. Cir. 1979)....................................................50

*AT&T Corp. v. FCC*,
394 F.3d 933 (D.C. Cir. 2005)....................................................21

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988)....................................................42

*Chamber of Comm. of the U.S.A. v. FCC*,
69 F.3d 600 (D.C. Cir. 1995)....................................................53, 54

*\*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)................................................ 39, 40, 41, 44, 47, 48, 50

*\*City of Arlington v. FCC*,
133 S. Ct. 1863 (2013)....................................................38, 42, 44

*Clark v. Martinez*,
541 U.S. 371 (2005)....................................................54

*Contractors Ass'n of E. Pa. v. Sec'y of Labor*,
442 F.2d 159 (3d Cir. 1971) ....................................................51, 52

*DeVargas v. Mason & Hanger-Silas Mason Co.*,
911 F.2d 1377 (10th Cir. 1990) ....................................................49

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg.*
*& Constr. Trades Council*,
485 U.S. 568 (1988)....................................................53

*EEOC v. Arabian Am. Oil Co.*,
499 U.S. 244 (1991)....................................................43

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Estate of Medcare HMO*,
    998 F.2d 436 (7th Cir. 1993) ...................................................................34, 35

*Express Scripts, Inc. v. Wenzel*,
    262 F.3d 829 (8th Cir. 2001) ........................................................................34

*Fabi Constr. Co. v. Sec'y of Labor*,
    508 F.3d 1077 (D.C. Cir. 2007)....................................................................27

*Fina Oil & Chem. Co. v. Norton*,
    332 F.3d 672 (D.C. Cir. 2003)......................................................................20

*Fisher v. Univ. of Tex.*,
    133 S. Ct. 2411 (2013)..................................................................................55

*Huston v. Proctor & Gamble Paper Prods. Corp.*,
    568 F.3d 100 (3d Cir. 2009) .........................................................................12

*Jacobson v. Delta Airlines, Inc.*,
    742 F.2d 1202 (9th Cir. 1984) ......................................................................49

*Liberty Mut. Ins. Co. v. Friedman*,
    639 F.2d 164 (4th Cir. 1981) ....................................................4, 5, 51, 52, 53

*Local 28 Int'l Ass'n Sheet Metal Workers v. EEOC*,
    478 U.S. 421 (1986)................................................................................44, 45

*Lutheran Church–Mo. Synod v. FCC*,
    154 F.3d 487 (D.C. Cir. 1998)......................................................................56

*MD/DC/DE Broadcasters Ass'n v. FCC*,
    236 F.3d 13 (D.C. Cir. 2001)......................................................5, 55, 56, 57

*Nat'l Ass'n of Homebuilders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)........................................................................21, 25, 27

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U. S. 101 (2002) ...............................................................................43, 44

## TABLE OF AUTHORITIES
### (continued)

Page

*Partridge v. Reich*,
141 F.3d 920 (9th Cir. 1998) ..........................................................49

*Petit v. U.S. Dep't of Educ.*,
675 F.3d 769 (D.C. Cir. 2012).............................................21, 25, 27

*Reynolds v. Sch. Dist. No. 1*,
69 F.3d 1523 (10th Cir. 1995) .......................................................48

*Ricci v. DeStefano*,
557 U.S. 557 (2009).................................................................4, 45

*Rush Prudential HMO, Inc. v. Moran*,
536 U.S. 355 (2002)........................................................................34

*Russello v. United States*,
464 U.S. 16 (1983)..........................................................................44

*Sec'y of Labor v. Twentymile Coal Co.*,
411 F.3d 256 (D.C. Cir. 2005)......................................................27

*Shotz v. Am. Airlines, Inc.*,
420 F.3d 1332 (11th Cir. 2005) ....................................................49

*Thomas Jefferson Univ. v. Shalala*,
512 U.S. 504 (1994).......................................................................27

*Thornton v. Nat'l R.R. Passenger Corp.*,
16 F. Supp. 2d 5 (D.D.C. 1998)....................................................48

*United States v. Fordice*,
505 U.S. 717 (1992)........................................................................47

*United States v. Mead Corp.*,
533 U.S. 218 (2001)........................................................................42

*United States v. Riverside Bayview Homes, Inc.*,
474 U.S. 121 (1985)........................................................................27

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Trucking Mgmt., Inc.*,
    662 F.2d 36 (D.C. Cir. 1981)......................................................................48

*Univ. of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2002)..................................................................53

*Venkatraman v. REI Sys., Inc.*,
    417 F.3d 418 (4th Cir. 2005) .....................................................................49

*Vill. of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011)..............................................................42, 43

*Wilkerson v. New Media Tech. Charter Sch. Inc.*,
    522 F.3d 315 (3d Cir. 2008) ......................................................................12

## ADMINSTRATIVE CASES

*In re Bridgeport Hosp.*,
    ARB Case No. 00-034, 2003 WL 244810 (DOL Adm. Rev. Bd.
    Jan. 31, 2003)...............................................................4, 32, 33, 36

*In re Fla. Hosp. of Orlando*,
    ARB Case No. 11-011, 2013 WL 3981196 (DOL Adm. Rev. Bd.
    July 22, 2013) ....................................................3, 4, 24, 36, 37

*OFCCP v. Greenwood Mills, Inc.*,
    ARB Case Nos. 00-044, 01-089, ARB Final Decision & Order
    (Dep't of Labor Dec. 20, 2002) .................................................12

*OFCCP v. USAA Fed. Sav. Bank*,
    87-OFC-27 (ALJ Oct. 4, 1990), *available at*
    http://www.oalj.dol.gov/PUBLIC/OFCCP/DECISIONS/
    ALJ_DECISIONS/OFC/9010USAA_TXT.HTM#.....................................49

## STATUTES, CODES, RULES & OTHER AUTHORITIES

5 U.S.C. § 706...............................................................................................20

5 U.S.C. § 8913.............................................................................................24

# TABLE OF AUTHORITIES
## (continued)

Page

28 U.S.C. § 1291 ...................................................................5

28 U.S.C. § 1331 ...................................................................5

29 U.S.C. § 793,
    Section 503 of the Rehabilitation Act of 1973 ....................6, 8, 9, 22, 40, 43

38 U.S.C. § 4212,
    Section 402 of the Vietnam Era Veterans'
    Readjustment Assistance Act of 1974 ...................................6, 8, 9, 22, 40, 43

40 U.S.C. § 101, *et seq.*,
    Fed. Prop. & Admin. Servs. Act of 1949 ....................... 4, 22, 40, 41, 42, 43,
    .......................................................... 45, 46, 50, 51, 52, 53, 54, 57

40 U.S.C. § 101 ...............................................................7, 50

40 U.S.C. § 121 .........................................................7, 42, 45, 50

40 U.S.C. § 122 ......................................................7, 46, 47, 48, 49

42 U.S.C. § 2000d *et seq.*,
    Title VI of the Civil Rights Act of 1964...........................................46, 47, 48

42 U.S.C. § 2000d-1 ...............................................................48

42 U.S.C. § 2000d-3 ...............................................................48

42 U.S.C. § 2000e *et seq.*,
    Title VII of the Civil Rights Act of 1964 .............. 4, 7, 11, 12, 22, 43, 44, 45,
    .......................................................................47, 48, 57

42 U.S.C. § 2000e-2 .........................................................7, 45

42 U.S.C. § 2000e-5 ...............................................................44

P.L. 744, Pennsylvania Human Relations Act, No. 222 ...................................11, 12

40 PA. STAT. §§ 1551-67 ...............................................................34

### TABLE OF AUTHORITIES
#### (continued)

**Page**

41 C.F.R. §§ 60-1 *et seq.* ................................................................9

41 C.F.R. § 60-1.3 .................................................................7, 26, 29

41 C.F.R. § 60-1.4 ........................................................................9, 38

41 C.F.R. § 60-1.7 ............................................................................17

41 C.F.R. § 60-1.12 ..........................................................................17

41 C.F.R. § 60-1.20 ..........................................................................18

41 C.F.R. § 60-1.40 .......................................................................9, 38

41 C.F.R. § 60-2.1 .......................................................................13, 17

41 C.F.R. § 60-2.10 .........................................................................56

41 C.F.R. § 60-2.11 ..........................................................................17

41 C.F.R. § 60-2.12 .....................................................................13, 17

41 C.F.R. § 60-2.13 ..........................................................................17

41 C.F.R. § 60-2.14 ................................................................13, 14, 17

41 C.F.R. § 60-2.15 ................................................................14, 15, 17

41 C.F.R. § 60-2.16 ....................................................................15, 17

41 C.F.R. § 60-2.17 ....................................................................15, 18

41 C.F.R. §§ 60-250 *et seq.* ..........................................................9

41 C.F.R. § 60-250.2 .................................................................7, 26, 29

41 C.F.R. § 60-250.5 ..........................................................................9

41 C.F.R. §§ 60-741 *et seq.* ..........................................................9

41 C.F.R. § 60-741.2 .................................................................7, 26, 29

## TABLE OF AUTHORITIES
### (continued)

**Page**

41 C.F.R. § 60-741.5 .................................................................9

45 C.F.R. § 800.10 .............................................................31, 34

45 C.F.R. § 800.20 .............................................................31, 34

48 C.F.R. § 22.801 ...............................................................7, 26

48 C.F.R. ch. 16 ...............................................................24, 25

48 C.F.R. § 1601.101 .........................................................24, 28

48 C.F.R. § 1601.102 ...............................................................24

48 C.F.R. § 1601.103 .........................................................24, 28

48 C.F.R. § 1601.301 .........................................................24, 28

48 C.F.R. § 1602.170-1 .......................................................24, 31

*48 C.F.R. § 1602.170-15................................................2, 6, 25, 26, 49

Allegheny County Code, Ch. 215, Art. V,
   §§ 215-30 to 215-38..............................................................11, 12

Exec. Order No. 11246,
   30 Fed. Reg. 12,935 (Sept. 24, 1965) ...........................6, 8, 9, 11, 22, 38, 39,
   ....................................................40, 41, 43, 44, 47, 48, 50, 54

39 Fed. Reg. 2075 (Jan. 15, 1974) .........................................................9

*52 Fed. Reg. 16,032 (May 1, 1987) ......................................23, 24, 25, 26, 28, 29

54 Fed. Reg. 43,089 (Oct. 20, 1989)........................................................33

55 Fed. Reg. 27,406 (July 2, 1990)......................................................26, 33

59 Fed. Reg. 14,761 (Mar. 30, 1994)........................................................26

62 Fed. Reg. 47,569 (Sept. 10, 1997) .....................................................33

## TABLE OF AUTHORITIES
### (continued)

Page

65 Fed. Reg. 68,022 (Nov. 13, 2000) ................................................13, 14

67 Fed. Reg. 64,272 (Oct. 17, 2002)......................................................41

70 Fed. Reg. 31,374 (June 1, 2005) ......................................................26

*76 Fed. Reg. 38,282 (June 29, 2011) ...................................24, 31, 33

78 Fed. Reg. 13,508 (Feb. 28, 2013) ..............................................11, 12

Dep't of Labor, OFCCP FEDERAL CONTRACT COMPLIANCE MANUAL (July
    2013), http://www.dol.gov/ofccp/regs/compliance/fccm/
    FCCM_FINAL_508c.pdf .......................................13, 15, 16, 18,
    ..............................................................................................19

Dep't of Labor, OFCCP, *Notice for Federal Contractors on Use of the 2006-
    2010 Census EEO Tabulation in the Development of Affirmative
    Action Programs (AAPs)*, http://www.dol.gov/ofccp/OFCCPNews/
    Census_EEO_Tab_508c.pdf..........................................................14

OFCCP, *EO 11246, EEO and Affirmative Action Guidelines for Federal
    Contractors Regarding Race, Color, Gender, Religion, and National
    Origin*, *available at*
    http://www.dol.gov/ofccp/regs/compliance/fs11246.htm (last visited
    Sept. 13, 2013) ............................................................................16

OFCCP, *Final Rule: Section 503 of the Rehabilitation Act*,
    http://www.dol.gov/ofccp/regs/compliance/section503.htm (last
    visited Sept. 13, 2013) .................................................................19

OFCCP, *Section 503 Regulatory Procedures & Burden Analysis* (2013),
    http://www.dol.gov/ofccp/regs/ compliance/section503/503_
    regulation_procedures_qa_508c.pdf ...........................................20

OFCCP, *Final Rule: Vietnam Era Veterans Readjustment Assistance Act*,
    http://www.dol.gov/ofccp/regs/compliance/vevraa.htm (last visited
    Sept. 13, 2013).......................................................................19, 20

# TABLE OF AUTHORITIES
## (continued)

Page

OFCCP, *VEVRAA Regulatory Procedures and Burden Analysis* (2013),
http://www.dol.gov/ofccp/regs/compliance/vevraa/vevraa_regulatory_
procedures_qa_508c.pdf .................................................................................20

OFCCP, *Policy Directive 262* (Mar. 17, 2003),
http://www.dol.gov/ofccp/regs/compliance/directives/dir262.pdf...............36

OFCCP, *Policy Directive 293* (Dec. 16, 2010),
http://www.healthcareemploymentcounsel.com/examining-
room/OFCCPDirective293.pdf.............................................................36, 37

OFCCP, *Policy Directive 301* (Apr. 25, 2012),
http://www.dol.gov/ofccp/regs/compliance/ directives/dir301.pdf...............37

Office of Info. & Reg. Affairs, *Final Supply & Service Supporting Statement*
38-52 (Sept. 12, 2011),
http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=2011
04-1250-001 (follow "Final Supply and Service" hyperlink)..........14, 18, 55

OPM, *Healthcare*, http://www.opm.gov/healthcare-insurance/healthcare/
(last visited Sept. 12, 2013) .....................................................................23, 24

*OPM, *Healthcare–Carriers*, http://www.opm.gov/healthcare-
insurance/healthcare/carriers/ (last visited Sept. 12, 2013).....................31, 33

OPM, *Healthcare–Consumer Protections*, http://www.opm.gov/healthcare-
insurance/healthcare/ consumer-protections/#url=Bill-of-Rights (last
visited Sept. 12, 2013) ...................................................................................24

OPM, *Healthcare–Plan Information, 2013 Plan Information for
Pennsylvania*, http://www.opm.gov/healthcare-
insurance/healthcare/plan-information/plan-codes/2013/states/pa.asp
(last visited Sept. 7, 2013) .......................................................................30, 31

OPM, *Multi-State Plan Program and the New Health Insurance
Marketplace*, http://www.opm.gov/healthcare-insurance/multi-state-
plan-program/ (last visited Sept. 12, 2013) ...................................................31

## TABLE OF AUTHORITIES
### (continued)

**Page**

Patricia Shiu, OFCCP Director, Prepared Remarks, Indus. Liaison Grp. 2013
    Nat'l Conference (July 31, 2013) http://www.dol.gov/ofccp/addresses/
    Director_address_NILG_Jul312013.htm (last visited Sept. 12, 2013) ...15, 16

## GLOSSARY

| | |
|---|---|
| AAP | Affirmative Action Plan |
| ALJ | Administrative Law Judge |
| AR | Administrative Record |
| ARB | Administrative Review Board |
| DOL | Department of Labor |
| EO 11246 | Executive Order 11246 |
| FAR | Federal Acquisition Regulation |
| FCCM | Federal Contract Compliance Manual |
| FEHBAR | Federal Employees Health Benefits Acquisition Regulation |
| FEHBP | Federal Employee Health Benefits Program |
| HMO | Health Maintenance Organization |
| JA | Joint Appendix |
| OFCCP | Office of Federal Contract Compliance Programs |
| OPM | Office of Personnel Management |
| PHRA | Pennsylvania Human Rights Act |
| UPMC | University of Pennsylvania Medical Center |
| VEVRAA | Vietnam Era Veterans' Readjustment Assistance Act |

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

### No. 13-5158

————————

UPMC BRADDOCK, UPMC McKEESPORT,
and UPMC SOUTHSIDE,

Appellants,

v.

THOMAS E. PEREZ, in his official capacity as
Secretary of the United States Department of Labor; UNITED STATES
DEPARTMENT OF LABOR; TRACIE C. BROWN, in her official capacity as
District Director, United States Department of Labor OFCCP; and
OFFICE OF FEDERAL CONTRACT COMPLIANCE PROGRAMS,

Appellees.

————————

Appeal from the United States District Court for the District of Columbia,
No. 09-1210, Judge Paul L. Friedman

————————

## BRIEF FOR APPELLANTS

————————

## <u>PRELIMINARY STATEMENT</u>

Appellants UPMC Braddock, UPMC McKeesport, and UPMC Southside

(the "Hospitals") have no contracts with the federal government. In the past, they

sometimes cared for patients who were federal employees or dependents covered

by the Federal Employee Health Benefits Program ("FEHBP").  Only UPMC

McKeesport continues to provide such service today.[1]

For more than 25 years, healthcare providers like the Hospitals have not

been considered federal "subcontractors" subject to various government contract

obligations.  In particular, regulations issued by the Office of Personnel

Management ("OPM") in 1987, under the authority of the Federal Employee

Health Benefits Act, provide expressly that direct healthcare providers are not

"subcontractors."  *See* 48 C.F.R. § 1602.170-15 ("Subcontractor means any

supplier, distributor, vendor, or firm that furnishes supplies or services to or for a

prime contractor or another subcontractor, *except for providers of direct medical*

*services or supplies pursuant to the Carrier's health benefits plan.*" (emphasis

added)).

Despite this longstanding administrative practice, the Office of Federal

Contract Compliance Programs ("OFCCP") is now attempting to expand its

regulatory jurisdiction to cover direct healthcare providers like the Hospitals,

which provide services to federal employees receiving health coverage under

---

[1]  UMPC Braddock is an inactive entity and no longer serves patients.  Its hospital
facility was demolished.  UPMC Southside has merged into UPMC Mercy and is
no longer a separately licensed hospital or separate legal entity.

2

OPM's contracts with other entities.[2]  OFCCP's initiative is not the result of any

specific findings or studies about unlawful discrimination in the healthcare sector.

For decades, the Hospitals and other healthcare providers have been subject to

federal, state, and local laws prohibiting employment discrimination, and OFCCP

has not suggested that those laws have been ineffective.  Nevertheless, OFCCP and

the other appellees seek in this proceeding to impose complex and demanding

affirmative action regulations and lengthy compliance audits (the "affirmative

action scheme") on the Hospitals and presumably on other similarly situated

healthcare employers.[3]

OFCCP's arguments for jurisdiction over direct healthcare providers who

treat patients covered by the FEHBP are meritless.  As reflected in the OPM

regulation, the FEHBP is designed to provide federal employees with access to

healthcare services.  "OPM was acting as a human resources office securing health

---

[2]  In addition to this case, OFCCP has argued in another pending case that direct health care providers are government "subcontractors" when they treat patients covered by the Department of Defense's TRICARE program.  OFCCP has continued to champion that argument even after Congress amended the relevant statute in direct response to the agency's arguments.  *See generally In re Fla. Hosp. of Orlando*, ARB Case No. 11-011, 2013 WL 3981196, at *9 (DOL Adm. Rev. Bd. July 22, 2013) ("*Fla. Hosp.*").

[3]  These requirements are described in detail in Part D of the "Factual and Procedural Background" section below.  The Hospitals use the term "affirmative action scheme" to include all of the OFCCP affirmative action requirements, compliance regulations, and enforcement mechanisms regarding the two statutes and the Executive Order at issue in this case.

insurance, not running a government funded healthcare program." *Fla. Hosp.*,

2013 WL 3981196, at *20. Approximately ten years ago, OFCCP was

unsuccessful in its attempt to extend its regulatory authority to hospitals that

provided services to federal employees who were covered by traditional health

insurance obtained from Blue Cross. *In re Bridgeport Hosp.*, ARB Case No. 00-

034, 2003 WL 244810,at *1 (DOL Adm. Rev. Bd. Jan. 31, 2003). Now, however,

notwithstanding the *Bridgeport* ruling, OFCCP seeks to exert authority over the

Hospitals on the theory that they provide or provided services to federal employees

who obtain healthcare coverage from a health maintenance organization ("HMO")

rather than a traditional insurer like Blue Cross. OFCCP thus seeks to rely on a

hyper-technical and illogical distinction between HMOs and traditional insurance

arrangements that entails no functional difference in the healthcare coverage for

which OPM contracts or in the services provided to patients by the Hospitals and

other direct providers.

Equally meritless are OFCCP's arguments that Title VII of the Civil Rights

Act of 1964 and the Federal Property and Administrative Services Act of 1949

authorize the agency to impose race and gender affirmative action obligations on

direct healthcare providers. Under both of those laws, affirmative action is

justified only as a remedy for unlawful discrimination. *Ricci v. DeStefano*, 557

U.S. 557, 582 (2009); *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170-71

(4th Cir. 1981). There is no record evidence of unlawful discrimination by healthcare employers. Moreover, OFCCP's argument that findings of discrimination are not required to impose race and gender affirmative action obligations raises serious equal protection concerns nearly identical to those addressed by this Court in *MD/DC/DE Broadcasters Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001), as we explain in further detail below.

OFCCP's efforts to expand its regulatory domain at the expense of direct healthcare providers that are already highly regulated are unnecessary and contrary to OPM's objective of providing federal employees with a broad range of healthcare options. They can serve only to increase healthcare costs without any commensurate benefit to providers, patients, or employees.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment on March 30, 2013, granting appellees' motion for summary judgment and denying the Hospitals' motion for summary judgment. The Hospitals filed a timely notice of appeal on May 28, 2013. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether OFCCP improperly and unnecessarily sought to subject the Hospitals to the Department of Labor's affirmative action scheme, even though (a)

5

the government contracting entity, OPM, expressly provided that the Hospitals would not be considered subcontractors, (b) the Hospitals are already subject to extensive federal, state, and local anti-discrimination laws, and (c) OFCCP never suggested that the Hospitals had discriminated against any protected class.

2.      Whether OFCCP improperly sought to assert regulatory jurisdiction over the Hospitals, even though OPM contracted with the UPMC Health Plan to obtain access to health care for federal employees, rather than direct medical care for those employees.

3.      Whether OFCCP lacks adequate statutory authority for invoking Executive Order 11246 as its basis for asserting regulatory jurisdiction over the Hospitals with respect to race, ethnicity, and gender.

## PERTINENT STATUTES AND REGULATIONS

Several relevant statutes and regulations and Executive Order 11246 are reproduced in full in an addendum to this brief, as follows:

- The two statutes and Executive Order giving rise to the affirmative action scheme at issue:  Executive Order 11246, 30 Fed. Reg. 12,935 (Sept. 24, 1965); Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793; and Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("VEVRAA"), 38 U.S.C. § 4212.

- The OPM subcontractor definition that specifically excludes medical providers as subcontractors.  48 C.F.R. § 1602.170-15.

- The Federal Acquisition Regulation definition of "subcontractor" in the chapter on equal employment

6

opportunity and the OFCCP affirmative action regulations subcontractor definitions.  48 C.F.R. § 22.801; 41 C.F.R. §§ 60-1.3, 60-250.2(*l*), 60-741.2.

- The Title VII provision against racial balancing.  42 U.S.C. § 2000e-2(j).

- The Property Act, Section 122, regarding non-discrimination and other sections discussing economic efficiency in contracting.  40 U.S.C. §§ 101, 121, 122.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Contractual Relationships At Issue.

The Office of Personnel Management ("OPM") is responsible for administering the Federal Employees Health Benefits Program (the "FEHBP") to provide for the healthcare needs of federal employees.  It does so by contracting with a wide variety of entities, including traditional insurers and HMOs, which offer benefits to federal employees.  As part of this program, OPM contracted with the UPMC Health Plan (the "Plan"), a licensed HMO, to provide healthcare access.  JA 152-54.  The Plan is an HMO that does not provide direct medical services.  JA 158-59, 272.  Rather, it contracts with various entities, including independent hospitals and doctors' offices, that provide those services.  JA 158-60.

Years before the Plan entered into its agreement with OPM, the Plan contracted with the Hospitals to provide direct medical services to persons whose employers had purchased coverage from the Plan.  JA 152-56.  Subsequently, the Plan entered into its agreement with OPM.  The Hospitals never contracted with

7

the federal government.  The Plan/OPM contract expressly provided, in accordance
with an OPM regulation issued for the FEHBP, that the various hospitals and other
medical providers available to Plan beneficiaries would not be considered
subcontractors under the Plan/OPM contract.  JA 199.

### B.    OFCCP Seeks To Subject The Hospitals To The Federal Subcontractor Affirmative Action Scheme.

Some four years after OPM entered into its agreement with the Plan, OFCCP
sought to subject the Hospitals to its onerous affirmative action scheme for federal
contractors and subcontractors.  Appellees, including the Department of Labor
("DOL"), have invoked three alleged sources of authority for this scheme:

- Executive Order 11246, 30 Fed. Reg. 12,935 (Sept. 24, 1965) ("EO 11246"), which prohibits federal contractors from engaging in discrimination based on race, color, religion, sex, or national origin against their employees and applicants for employment.

- Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793, which requires certain government contractors and subcontractors to take "affirmative action to employ and advance in employment qualified individuals with disabilities."

- Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("VEVRAA"), 38 U.S.C. § 4212, which requires certain government contractors and subcontractors to take "affirmative action to employ and advance in employment qualified covered veterans."

The Secretary of Labor has authority to issue regulations to implement EO 11246 and the statutes and has done so.[4]  Although EO 11246 does not contain any such requirement, the regulations issued under EO 11246 require that federal contractors and subcontractors engage in affirmative action regarding the employment of, among others, women and minorities.  *See* 41 C.F.R. §§ 60-1.4, 60-1.40.  These regulations also require that clauses implementing the regulatory requirements be included in all qualifying federal contracts and subcontracts.  They further provide that such clauses are deemed included in all such contracts as a matter of law, regardless of whether they actually appear in the agreements.  *See* 41 C.F.R. §§ 60-1.4, 60-250.5, 60-741.5.  The Plan's contract with OPM specifically provided—in accordance with OPM's regulations for the FEHBP—that medical providers are not subcontractors.  The contracts between the Plan and the Hospitals, which pre-dated the OPM/Plan agreement, do not contain contractual clauses incorporating DOL's affirmative action scheme.

---

[4]  EO 11246 directly authorizes the Secretary of Labor to issue rules and regulations.  *See* EO 11246 § 202(7).  Congress authorized the President to issue regulations under the Rehabilitation Act, and the President delegated that authority to the Secretary of Labor.  *See* 29 U.S.C. § 793(a); Exec. Order No. 11758, 39 Fed. Reg. 2075 (Jan. 15, 1974).  Congress directly authorized the Secretary of Labor to issue regulations for VEVRAA.  *See* 38 U.S.C. § 4212(a)(2).  The EO 11246 regulations are at 41 C.F.R. Part 60-1, the Rehabilitation Act regulations are at 41 C.F.R. Part 60-741, and the VEVRAA regulations are at 41 C.F.R. Part 60-250.

OFCCP administers DOL's affirmative action program and the associated record-keeping and audit requirements.  In January 2004, OFCCP sent letters to each of the Hospitals stating that they had been selected for a compliance review and requesting that they permit an on-site inspection and submit information showing compliance with the affirmative action scheme.  JA 161-81.  The Hospitals responded that they are not subject to such requirements because they are not government subcontractors.  JA 187.

OFCCP and the other appellees then initiated administrative proceedings to enforce the affirmative action scheme.  AR 1-17.  The parties filed cross-motions for summary judgment, and the ALJ issued a recommended decision and order granting summary judgment against the Hospitals.  JA 63-82.  The ARB upheld the ALJ's decision and ruled that OPM's regulation excluding medical providers as subcontractors is invalid and that the Hospitals are federal subcontractors subject to the affirmative action scheme.  JA 49-62.  The Hospitals sought review in the district court, and both sides again moved for summary judgment.  The district court sustained the ARB's decision against the Hospitals, holding that the OPM regulation is invalid and that the Hospitals are subject to OFCCP regulation.  JA 9-46.

**C.    The Hospitals Already Are Subject To Federal, State, And Local Anti-Discrimination Laws That Prohibit The Same Discriminatory Practices As Executive Order 11246.**

To put DOL's affirmative action scheme in context, it is important to recognize the anti-discrimination laws that are fully applicable, whether or not the Hospitals are held to be subject to OFCCP's regulatory jurisdiction.  The Hospitals are subject to overlapping layers of anti-discrimination laws that prohibit employment discrimination on the basis of race, color, religion, national origin, and sex.  Specifically, the Hospitals are subject to the non-discrimination provisions of: (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"), (2) the Pennsylvania Human Relations Act, P.L. 744, No. 222 ("PHRA"), and (3) Allegheny County Code, Ch. 215, Art. V, §§ 215-30 to 215-38 (adopted July 1, 2009 by Ord. No. 26-09).  Each of these laws prohibits discriminatory employment practices in a manner similar to the prohibitions of EO 11246.

Title VII prohibits employment discrimination on the basis of race, color, religion, national origin, and sex.  42 U.S.C. § 2000e *et seq.*  Title VII's prohibitions against discrimination generally coincide with the non-discrimination requirements of EO 11246.  *See* 78 Fed. Reg. 13,508, 13,509 (Feb. 28, 2013) ("OFCCP will be applying Title VII principles as the basis for determining whether a contractor has violated the Executive Order's ban on pay discrimination,

11

just as the agency does in assessing contractor compliance with respect to all other

employment practices."); *OFCCP v. Greenwood Mills, Inc.*, ARB Case Nos. 00-

044, 01-089, ARB Final Decision and Order at 1 (Dep't of Labor Dec. 20, 2002).

Similarly, the Hospitals are subject to the PHRA, which courts uniformly

have interpreted as granting employees the same protections as Title VII. *See*, *e.g.*,

*Huston v. Proctor & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d

Cir. 2009); *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 318

(3d Cir. 2008).

The Hospitals are subject to local law as well.  Specifically, the Allegheny

County Code prohibits employment discrimination on the basis of "race, color,

religion, national origin, ancestry or place of birth, sex, gender identity or

expression, sexual orientation, disability, marital status, familial status, age or use

of a guide or support animal."  Allegheny Cnty. Code § 215-32(A).  Allegheny

County has also established a Human Relations Commission to administer and

enforce its anti-discrimination ordinance, including by initiating, receiving, and

investigating complaints of unlawful practices.  *Id.* § 215-36(B).

### D.    The Affirmative Action Scheme Is Highly Demanding And Goes Far Beyond Prohibiting Unlawful Discrimination.

The DOL affirmative action scheme at issue here does much more than

ensure non-discrimination in employment.  In particular, the affirmative action

scheme mandates that employers (1) develop and implement affirmative action

programs ("AAPs") on an annual basis for each facility with 50 or more employees and (2) permit access for OFCCP to conduct periodic compliance reviews of the written AAPs and supporting data.  As explained in greater detail below, compliance with these requirements is onerous, complex, and expensive.

### 1.    OFCCP Requires Annual Affirmative Action Programs.

Under the OFCCP regulations, each employer with 50 employees and a $50,000 government contract must develop a written AAP for women and minorities for each of its facilities with 50 or more employees.  41 C.F.R. § 60-2.1(b).  All employees of the contractor must be included in an AAP, and there are various rules for how to allocate employees to AAPs.  *Id.* § 60-2.1(d).

Preparing the written AAPs involves significant effort and requires at least nine discrete steps:

1.    All jobs included within the particular AAP must be organized into AAP job groups.  41 C.F.R. § 60-2.12.  The job groups must be large enough for meaningful statistical analysis and must group jobs that are similar in terms of responsibilities, compensation, and opportunities for advancement.  *Id.*; Dep't of Labor, OFCCP FEDERAL CONTRACT COMPLIANCE MANUAL ("FCCM") § 1F02(d) (July 2013), http://www.dol.gov/ofccp/regs/compliance/fccm/FCCM_FINAL_508c.pdf.

2.    The employer must identify an appropriate census occupational category for each job and the relevant geographic labor market for external hiring into the job.  41 C.F.R. § 60-2.14(d); 65 Fed. Reg. 68,022, 68,032 (Nov. 13, 2000).

3.    The employer must identify the internal promotion patterns between each job group to develop "feeder pools" to estimate the internal "availability" of women and minorities for

13

promotions.  41 C.F.R. § 60-2.14(c); 65 Fed. Reg. at 68032. This must include an employee-by-employee determination of "which employees could be promoted or transferred with appropriate training which the contractor is reasonably able to provide."  65 Fed. Reg. at 68,032.

4.    The employer must identify the relative frequency of internal promotions and external hires for each job group.  41 C.F.R. § 60-2.14(c).  This information is used to develop a weighting between internal and external availability estimates when combining those estimates into an overall availability estimate for each job group.

5.    The employer must use the information developed in the prior steps to prepare a statistical "availability analysis" derived from U.S. Census labor market data and internal feeder pool data.  41 C.F.R. § 60-2.14(d); 65 Fed. Reg. at 68032; DOL, OFCCP, *Notice for Federal Contractors on Use of the 2006-2010 Census EEO Tabulation in the Development of Affirmative Action Programs (AAPs)*, http://www.dol.gov/ofccp/ OFCCPNews/Census_EEO_Tab_508c.pdf.  The "composite availability" estimate for each job group is expressed as a percentage of women and minorities and represents the expected representation of women and minorities for the job group.  41 C.F.R. § 60-2.14(g); 65 Fed. Reg. at 68,032-33.

6.    The employer must "compare the percentage of minorities and women in each job group" with the composite availability estimate.  41 C.F.R. § 60-2.15(a).

7.    All of the above analyses must be reflected in various tables and reports within the AAP.  *See* 65 Fed. Reg. at 68,026-33 (describing required AAP analyses, including job group analysis and availability analysis, with illustrative tables); Office of Info. & Reg. Affairs, *Final Supply & Service Supporting Statement* 38-52 (Sept. 12, 2011), http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr =201104-1250-001 (follow "Final Supply and Service" hyperlink) ("Final S&S").

14

8.     The employer must establish "placement goals" for each job group where "the percentage of minorities or women employed in a particular job group is less than would reasonably be expected given their availability percentage in that particular job group." 41 C.F.R. § 60-2.15(b). "Placement goals serve as objectives or targets reasonably attainable by means of applying every good faith effort to make all aspects of the entire affirmative action program work." *Id.* § 60-2.16(a). In other words, "[i]f a contractor's utilization analysis reveals underutilization of minorities or women, or both, in any of the job groups the contractor must establish placement goals designed to cure the underutilization." FCCM § 1F03.

9.     The employer must develop "action oriented programs . . . to attain established goals and objectives. . . . [and] must demonstrate that it has made good faith efforts to . . . produce measurable results." 41 C.F.R. § 60-2.17(c).

Under the affirmative action scheme, developing an AAP is not merely a paperwork exercise or government report that must be filed—it is only the start of the affirmative action process. The AAP must then be implemented over the following year in order to "attain" the established "placement goals" for women and minorities. In a recent, high-profile address, OFCCP Director Patricia Shiu emphasized the agency's requirement of sustained effort to implement the AAPs:

> The AAP is your road map to success. It should be a living document that doesn't sit on a shelf, but is constantly reviewed, analyzed, referenced and updated. It should be utilized when decisions are being made about recruitment, applicant flow, hiring, firing, placement, promotions and compensation.

Prepared Remarks, Indus. Liaison Grp. 2013 Nat'l Conference (July 31, 2013)

http://www.dol.gov/ofccp/addresses/Director_address_NILG_Jul312013.htm (last

visited Sept. 12, 2013).

### 2. OFCCP Conducts Complex, Highly Technical Compliance Reviews.

As an incentive to ensure that contractors implement their AAPs, OFCCP

conducts periodic compliance reviews of contractors.  "A compliance review is a

comprehensive analysis and evaluation of the employment practices of the

contractor, including the contractor's written affirmative action program (AAP),

and the results of the contractor's affirmative action efforts."  FCCM § 1A00.

During the compliance review, OFCCP compliance officers review the AAP to

ensure that the contractor has implemented the regulatory requirements.  *See* EO

11246, *EEO and Affirmative Action Guidelines for Federal Contractors Regarding

Race, Color, Gender, Religion, and National Origin*, *available at*

http://www.dol.gov/ofccp/regs/compliance/fs11246.htm (last visited Sept. 13,

2013) ("During a compliance review, a compliance officer examines the

contractor's affirmative action program; checks personnel, payroll, and other

employment records; interviews employees and company officials; and

investigates virtually all aspects of employment in the company.").

OFCCP initiates the compliance review by sending the contractor a

"scheduling letter" requesting the following materials within thirty days:

16

Executive Order AAP:

1. An organizational profile prepared according to 41 C.F.R. § 60-2.11.

2. The formation of job groups (covering all jobs) consistent with criteria given in 41 C.F.R. § 60-2.12;

3. For each job group, a statement of the percentage of minority and female incumbents, as described in 41 C.F.R. § 60-2.13;

4. For each job group, a determination of minority and female availability that considers the factors given in 41 C.F.R. §§ 60-2.14(c)(1) and (2);

5. For each job group, the comparison of incumbency to availability, as explained in 41 C.F.R. § 60-2.15.

6. Placement goals for each job group in which the percentage of minorities or women employed is less than would be reasonably expected given their availability, consistent with 41 C.F.R. § 60-2.16.

Support Data

7. A copy of the contractor's Employer Information Report EEO-1 (Standard Form 100 Rev., *see* 41 C.F.R. § 60-1.7) for the last three years.

8. A copy of any collective bargaining agreement(s), if applicable. Please also include any other information already prepared that would assist in understanding your employee mobility system(s), e.g., promotion, etc.

9. Information on affirmative action goals for the preceding AAP year and, where applicable, progress on goals for the current AAP year. *See* 41 C.F.R. §§ 60-1.12(b), 60-2.1(c) and 60-2.16.

   For the preceding AAP year, this report must include information that reflects:

(a)    job group representation at the start of the AAP year,
(i.e., total incumbents, total minority incumbents, and
total female incumbents);

(b)    the percentage placement rates (% goals) established for
minorities and/or women at the start of the AAP year;
and

(c)    the actual number of placements (hires plus promotions)
made during the AAP year into each job group with goals
(i.e., total placements, total minority placements, and
total female placements). For goals not attained, describe
the specific good faith efforts made to achieve them.

If the contractor is six months or more into the AAP year on the
date it receives this listing, it must also submit information that
reflects progress on goals established in the current AAP, and
describe its implementation of action-oriented programs
designed to achieve these goals (*see* 41 C.F.R. § 60-2.17(c)).

*See* AR 1073-74, 1078-79, 1083-84; *see also* Final S&S 6-15.

After the contractor responds to the scheduling letter by submitting its AAP

and support materials, OFCCP starts its desk audit, in which it reviews all

materials submitted to determine if they satisfy "agency standards of

acceptability."  41 C.F.R. § 60-1.20(a)(1)(i).  Following the desk audit, OFCCP

may conduct an on-site review at the contractor's facility "to investigate

unresolved problem areas identified in the AAP and supporting documentation

during the desk audit [and] to verify that the contractor has implemented the

AAP."  41 C.F.R. § 60-1.20(a)(1)(ii).  OFCCP demands what it considers to be

good-faith efforts to correct underutilization, such as recruiting at high schools and

colleges that enroll a large number of women and minorities.  FCCM § 2E02.

18

When a contractor's efforts have not produced such results, the contractor must

explain:

- why its efforts were not effective,

- why it did not make additional or alternate efforts, and

- why its additional or alternate efforts, or both, were not sufficiently effective.

*Id.*  If the employer cannot demonstrate sufficient "good faith efforts" to OFCCP's

satisfaction, the employer will be cited for non-compliance and asked to sign a

conciliation agreement, providing for detailed reporting and monitoring by

OFCCP.  *See* FCCM § 2E01.[5]

Thus, being subject to the affirmative action scheme has significant, real-

world consequences having nothing to do with a company's commitment to non-

discrimination.[6]

---

[5]  The quota-like features of the affirmative action scheme appear to raise serious constitutional issues.  *See* Part II B(4)(c) of the "Argument" section below. Because the Hospitals have challenged the applicability of the OFCCP's affirmative action scheme, we have not yet needed to challenge directly the constitutionality of this scheme, but we reserve the right to do so in the future.

[6]  OFCCP recently published final regulations that will require contractors to develop numerical utilization goals and hiring benchmarks as part of the AAPs for individuals with disabilities and covered veterans.  The regulations are pending publication in the Federal Register but have been posted on OFCCP's website. *See Final Rule:  Section 503 of the Rehabilitation Act*, http://www.dol.gov/ofccp/regs/compliance/section503.htm (last visited Sept. 13, 2013) (individuals with disabilities); *Final Rule:  Vietnam Era Veterans Readjustment Assistance Act*,

## STANDARD OF APPELLATE REVIEW

As the ARB and the district court both acknowledged, the issues in this case are purely legal.  JA 17.  Thus, this Court's "task [is] precisely the same as the district court's."  *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 675-76 (D.C. Cir. 2003) (citation and internal quotation marks omitted, alteration in original).  This Court owes the district court's decision no deference and proceeds as if the appeal came directly to it in the first instance.  *Id.* at 676.

The APA authorizes judicial review of agency action and requires a reviewing court to set aside an agency decision that is "not in accordance with the law" or "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).  Although agency regulations within the scope of agency authority and interpretations of those regulations often are entitled to deference, such regulations

---

http://www.dol.gov/ofccp/regs/compliance/vevraa.htm (last visited Sept. 13, 2013) (covered veterans).  These regulations contain a host of other burdensome new requirements, and they are designated as having a "major" economic impact.  *See* OFCCP, *Section 503 Regulatory Procedures & Burden Analysis* 2 (2013), http://www.dol.gov/ofccp/regs/ compliance/section503/503_ regulation_procedures_qa_508c.pdf (individuals with disabilities)); OFCCP, *VEVRAA Regulatory Procedures and Burden Analysis* 1 (2013), http://www.dol.gov/ofccp/regs/compliance/vevraa/vevraa_regulatory_procedures_ qa_508c.pdf (covered veterans)).  In particular, OFCCP estimates that the aggregate burden on regulated entities associated with these new regulations may be more than $1 billion in initial compliance costs, with additional recurring compliance costs of more than $700 million annually.  *See Section 503 Regulatory Procedures & Burden Analysis* 9-10, (individuals with disabilities)); *VEVRAA Regulatory Procedures & Burden Analysis* 9-10 (covered veterans)).

and interpretations are entitled to no deference if the agency's interpretation is plainly erroneous or inconsistent with the regulation or statute. *See Nat'l Ass'n v. Homebuilders v. Defenders of Wildlife*, 551 U.S. 644, 672 (2007); *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 777-78 (D.C. Cir. 2012). This Court will reverse if the agency has committed a "clear error in judgment." *AT&T Corp. v. FCC*, 394 F.3d 933, 936 (D.C. Cir. 2005) (internal quotation marks omitted).

## SUMMARY OF THE ARGUMENT

OFCCP has asserted regulatory jurisdiction over the Hospitals based on the Hospitals' supposed status as subcontractors subject to the DOL affirmative action scheme. This attempt to assert regulatory jurisdiction should be rejected in its entirety for two reasons.

*First*, OPM, pursuant to its express congressional authority to issue regulations for government contracts in the FEHBP, has categorically excluded medical care providers from the definition of subcontractor. This definition is entitled to deference and controls the outcome here.

*Second*, even if medical providers are not categorically excluded as subcontractors, the Hospitals do not meet the subcontractor definition because their contract with the Plan is not "necessary to the performance" of the Plan's contract with OPM. OPM contracts with various entities to ensure that persons covered by the FEHBP have access to a variety of healthcare options. OPM's contract with

21

the Plan, which is an HMO, serves this goal in the same way as a contract with a traditional health insurance provider. The Plan's contracts with the Hospitals to provide the actual care are not necessary to fulfilling OPM's goal of providing access to a variety of healthcare options.

Independently, OFCCP's affirmative action scheme regarding women and minorities, pursuant to claimed authority under EO 11246, should also be rejected. Unlike the Rehabilitation Act and VEVRAA, which contain explicit affirmative action requirements, no federal statute contains language creating race and gender affirmative action obligations in employment for federal contractors or subcontractors. OFCCP created the affirmative action obligation for women and minorities in its regulation, and it has no statutory authority to do so, either directly or implicitly through Title VII or the Property Act. Moreover, the quota-like requirements of the affirmative action scheme raise serious constitutional issues, and thus, pursuant to the doctrine of constitutional avoidance, neither Title VII nor the Property Act should be interpreted in a manner that would authorize the dubious affirmative action scheme for women and minorities.

# ARGUMENT

## I.  THE HOSPITALS ARE NOT SUBJECT TO OFCCP'S AFFIRMATIVE ACTION PROGRAM AND THE ACCOMPANYING HIGHLY TECHNICAL COMPLIANCE REGIME.

The OFCCP affirmative action scheme applies to certain federal prime contractors and subcontractors.  The threshold issue in this case is whether the Hospitals fall within the subcontractor category.  The ARB determined that they do.  JA 52-60.  This conclusion is erroneous as a matter of law for two reasons.  *First*, under OPM's regulation governing contracts for the FEHBP, medical providers like the Hospitals are categorically excluded as subcontractors.  *Second*, even if the Hospitals are not categorically excluded, they do not meet the standard for subcontractors because their contracts with the Plan are not necessary to the performance of the Plan/OPM contract.

### A.  OPM Has Authority To Issue Regulations For The FEHBP.

Before analyzing the applicability of the affirmative action scheme, a discussion of OPM's role and authority provides important context.  OPM administers the FEHBP to provide healthcare access to federal employees.[7]  OPM enters into contracts with traditional insurers, HMOs, and other entities that offer

---

[7] *See* OPM, *Healthcare*, http://www.opm.gov/healthcare-insurance/healthcare/ (last visited Sept. 12, 2013) (describing FEHBP); 52 Fed. Reg. 16,032, 16,033 (May 1, 1987) ("OPM . . . contracts as an employer for health benefits on behalf of Federal employees.").

benefits to federal employees.[8]  As the ARB explained in a different case, in

contracting with these entities, "OPM was acting as a human resources office

securing health insurance, not running a government funded healthcare program."

*Fla. Hosp.*, 2013 WL 3981196, at *20.

Congress gave OPM the authority to issue regulations administering this

program.  *See* 5 U.S.C. § 8913; 48 C.F.R. § 1601.102.  OPM's benefits contracts

are considered acquisitions and thus come under the purview of the Federal

Acquisition Regulation ("FAR").  *See generally* 48 C.F.R. ch. 16.  OPM has

authority to issue regulations to implement and supplement the FAR to

accommodate "the practical realities associated with the unique nature of health

care procurements."  48 C.F.R. § 1601.301; *see also id.* §§ 1601.101(b), 1601.103;

52 Fed. Reg. at 16,032, 16,037.  These regulations are meant to be read together

with the FAR in administering the FEHBP.  48 C.F.R. §§ 1601.101, 1601.103; 52

---

[8]  *See* OPM, *Healthcare*, http://www.opm.gov/healthcare-insurance/healthcare/
(last visited Sept. 12, 2013) (stating that federal employees "enjoy the widest
selection of health plans in the country" and listing many types of plans); OPM,
*Healthcare–Consumer Protections*, http://www.opm.gov/healthcare-
insurance/healthcare/ consumer-protections/#url=Bill-of-Rights (last visited Sept.
12, 2013) ("With almost 300 plans with delivery systems that include managed
fee-for-service, preferred provider organizations, health maintenance organizations
and point-of-service products, FEHB enrollees can choose among a broad range of
health plans and providers."); 76 Fed. Reg. 38,282, 38,284 (June 29, 2011)
("OPM's goal is to offer Federal employees . . . a broad choice of health insurance
plans."); 48 C.F.R. § 1601.101(b) (describing OPM's program of "acquiring and
administering contracts with health insurance carriers"); *id.* § 1602.170-1 (defining
"carrier" to include many kinds of entities, including HMOs).

Fed. Reg. at 16,032, 16,035.  OPM's regulations, like those of any other agency,

are entitled to deference if not plainly erroneous or contrary to the authorizing

statute.  *See Nat'l Ass'n of Homebuilders*, 551 U.S. at 672; *Petit*, 675 F.3d at 777-

78.

> ### B.      OPM's Regulation Exempts The Hospitals From Subcontractor Status.

In 1987, OPM issued a comprehensive regulation to implement the FEHBP.

The regulation is called the Federal Employees Health Benefits Acquisition

Regulation ("FEHBAR").  *See* 48 C.F.R. ch. 16.  This regulation includes a

definition of subcontractor that specifically excludes "providers of direct medical

services or supplies pursuant to the Carrier's health benefits plan."  48 C.F.R.

§ 1602.170-15.  This definition was the product of specific deliberations on the

subject and came about in direct response to the notice and comment process.[9]

OPM has revised the FEHBAR repeatedly over the years, several times with

---

[9]  *See* 52 Fed. Reg. at 16,032 (stating that a number of carriers raised issues
regarding clarifying definitions in the regulation and that the definition of
subcontractors was "[o]f particular concern"); *id.* at 16,033 (noting that the
subcontractor definition was added to "clear up any questions that may arise"
regarding a portion of the regulation); *id.* at 16,035 (the subcontractor definition
was added to "clarify the application of [a certain provision] to HMOs"); *id.* (the
subcontractor definition excluding medical providers was added because OPM did
not intend "to review the records of and approve those entities," and having them
excluded would allow OPM to review contracts based on both price and cost
analysis); *id.* at 16,036 (adding a "significant events clause" to give OPM
increased control over entities excluded from the subcontractor definition).

specific reference to subcontractor issues, but it has never changed the "subcontractor" definition.[10]  It is undisputed that the Hospitals are not subcontractors under the OPM regulation.  JA 56.  The ARB gave no deference to OPM's regulation, and instead completely disregarded it.  In the ARB's view, the OPM regulation had to be rejected because it conflicted with another FAR provision.  *Id.*  Specifically, the FAR definition of "subcontractor" in the chapter on equal employment opportunity defines subcontractor in the same way as the OFCCP affirmative action regulations:

> Subcontract means any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee)—
>
> (1) For the purchase, sale, or use of personal property or nonpersonal services that, in whole or in part, are necessary to the performance of any one or more contracts.

48 C.F.R. § 22.801; *see also* 41 C.F.R. §§ 60-1.3, 60-250.2(*l*), 60-741.2.  OPM considered this definition but determined that it did not work in the unique context of healthcare delivery.  OPM therefore excluded medical providers from being subcontractors under the FEHBAR.  *See* 48 C.F.R. § 1602.170-15; 52 Fed. Reg. at 16,032-33, 16,035.

---

[10]  *See*, *e.g.*, 70 Fed. Reg. 31,374, 31,375 (June 1, 2005); 59 Fed. Reg. 14,761, 14,763 (Mar. 30, 1994); 55 Fed. Reg. 27,406, 27,413 (July 2, 1990); *compare* 52 Fed. Reg. at 16,039, *with* 48 C.F.R. § 1602.170-15.

The ARB viewed the two regulations as "directly contradict[ory]" and ruled that OPM's definition was invalid.  JA 56.  This ruling is not in accordance with the law.  Regulations should be interpreted so that they make sense as a whole and do not render a part of the regulation superfluous or a nullity.[11]  An agency interpretation that is plainly erroneous or inconsistent with a regulation, either in its plain language or its intent as expressed at the time of promulgation, must be set aside.[12]

The ARB nullified the OPM regulation with no consideration of OPM's authority or purpose and with no attempt to reconcile the provisions.  When read

---

[11]  *See Nat'l Ass'n of Homebuilders*, 551 U.S. at 668-69 (rejecting interpretation of a regulation that would render it superfluous and surplusage); *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1086 (D.C. Cir. 2007) (rejecting interpretation of a portion of a regulation because "when read in the context of the whole regulation, the Secretary's interpretation fails to make sense"); *Sec'y of Labor v. Twentymile Coal Co.*, 411 F.3d 256, 261 (D.C. Cir. 2005) (rejecting interpretation of a regulation that "would render [it] a nullity," stating that "[t]his Court will not adopt an interpretation of a statute or regulation when such an interpretation would render the particular law meaningless").

[12]  *See Nat'l Ass'n of Homebuilders*, 551 U.S. at 672 (agency interpretation that is "plainly erroneous or inconsistent with the regulation" is not entitled to deference (citation and internal quotation marks omitted)); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 130 & n.7 (1985) (interpreting regulation by looking at its plain language, history, and preamble); *Petit*, 675 F.3d at 779 ("[D]eference to an agency's interpretation of its regulation is required 'unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (second alteration in original))).

together, as OPM intended when drafting the FEHBAR, the FAR and OPM provisions indicate that prime contractors and subcontractors other than direct medical providers are subject to the affirmative action scheme. This is not a direct conflict, as the ARB determined. Reading the provisions together gives effect to both of them and accommodates OPM's need to make changes in its unique setting, under the authority delegated by Congress and as reflected in the regulation's plain text and history, rather than just declaring OPM's definition invalid.

The ARB emphasized (at JA 56) the Secretary of Labor's authority regarding the affirmative action scheme but completely overlooked OPM's authority to issue regulations to make the FAR workable in the FEHBP context. The ARB's statement (*id.*) that a contractual provision that conflicts with a federal statute is void misses the point. The contract language merely tracks the language in OPM's regulation. It is the regulation that is key, and OPM acted pursuant to its statutory authority in issuing the regulation. The district court expressed concern that applying the OPM regulation here would somehow cause it to apply to all government contracts. JA 25. That concern is unfounded. The OPM regulation, by its very terms and purpose, applies only to the unique circumstances existing with FEHBP contracts. *See* 48 C.F.R. §§ 1601.101(b), 1601.103, 1601.301; 52

Fed. Reg. at 16,032, 16,037. Thus, this regulation has no force outside that specific context.

Even if the ARB was correct that these provisions directly conflict and a choice must be made, the ARB erred in invalidating the OPM regulation. The ARB stated that the FAR definition is "directly applicable" to this case (*see* JA 56 n.38), but in fact the OPM regulation is the one that is narrowly targeted to the circumstances of this case. It applies not to the whole of government contracting, like the FAR definition, but only to the unique concerns arising in the healthcare delivery context. OPM, exercising the statutory authority expressly granted by Congress, considered the issue and determined that medical providers should be excluded from the scope of subcontractors. The ARB erred in not even considering OPM's expertise in such matters, much less deferring to its regulation. The ARB's wholesale rejection of the OPM's regulation should be set aside.

### C. Even If Not Excluded Altogether, The Hospitals Are Not Subcontractors Because Their Contracts Are Not Necessary To The Performance Of The Plan/OPM Contract.

Under the subcontractor definition in OFCCP's affirmative action scheme, a contract between a prime contractor and a third party must be "necessary to the performance" of the prime contractor's government contract for the third party to be considered a subcontractor. 41 C.F.R. §§ 60-1.3, 60-250.2(*l*), 60-741.2. Thus, if the Hospitals' contracts with the Plan are not necessary to the performance of the

Plan/OPM contract, then the Hospitals are not subcontractors, and the OFCCP's affirmative action scheme does not apply.

The ARB concluded that because the Plan is an HMO rather than a traditional insurer, the Plan operated "primarily" as a "health care delivery" provider "and not strictly" as an insurance provider.[13] JA 59-60. Thus, according to the ARB, if the Plan operated primarily as a healthcare delivery provider, its contracts with the Hospitals were necessary to the performance of its contract with OPM and therefore the Hospitals were subcontractors. *Id.* This analysis is incorrect and demonstrates a fundamental misunderstanding of the FEHBP.

To determine what is necessary to the performance of a contract, one must analyze the purpose of the contract and the intentions of the parties. OPM's goal in the FEHBP is to provide federal employees with access to health care. It does this by offering a wide variety of healthcare options through its contracts with HMOs, traditional insurers, and other entities.[14] From OPM's perspective, the kind

---

[13] The ARB stated in full that "the *Defendants* argue that they should be considered insurance providers" and that "the *Defendants* were operating primarily as health care delivery providers and not strictly as insurance providers." JA 59-60 (emphasis added). Of course, the defendants are the Hospitals, and there is no question that they are healthcare delivery providers, not insurers. The focus here is on the Plan's contract with OPM, not the Hospitals' pre-existing contracts with the Plan.

[14] For federal employees in Pennsylvania, for example, OPM offers twenty-three choices of health plans, including many traditional insurers and a few HMOs and other entities. OPM, *Healthcare–Plan Information, 2013 Plan Information for*

of entity with which OPM contracts is not the critical consideration.  OPM's

overriding objective is to provide federal employees access to a wide range of

healthcare options.  OPM treats all of the entities with which it contracts, including

HMOs, as "carriers" and often refers to them as "insurers."[15]  Indeed, the

Plan/OPM contract specifically refers to the Plan as the "carrier."  JA 193, 199.

When OPM contracted with the Plan, it knew that the Plan did not provide direct

healthcare services.  (In fact, the Plan as an entity is not even licensed in

Pennsylvania to provide direct healthcare services.)  OPM also knew that the

contract terms, consistent with the regulation, excluded healthcare providers from

being subcontractors.  Thus, OPM knew that the scope of the contract was to

provide access to healthcare as opposed to providing direct medical care.

---

*Pennsylvania*, http://www.opm.gov/healthcare-insurance/healthcare/plan-information/plan-codes/2013/states/pa.asp (last visited Sept. 7, 2013).

[15]  *See* 48 C.F.R. § 1602.170-1 (defining "carrier" to include, among others, HMOs and more traditional insurers); OPM, *Healthcare–Carriers*, http://www.opm.gov/healthcare-insurance/healthcare/carriers/ (last visited Sept. 12, 2013) (referring to HMOs as carriers); 76 Fed. Reg. at 38,284 (referring to OPM "taking steps to mitigate risks and eliminate barriers to entry" for HMOs as part of its "goal to offer Federal employees . . . a broad choice of health insurance plans"); *see also* OPM, *Multi-State Plan Program and the New Health Insurance Marketplace*, http://www.opm.gov/healthcare-insurance/multi-state-plan-program/ (last visited Sept. 12, 2013) (OPM describing its role in implementing the Affordable Care Act by contracting with "private health insurance issuers"); 45 C.F.R. § 800.10 (issuing standards for health insurance carriers to participate in the Affordable Care Act); *id.* § 800.20 (defining "health insurance carrier" as including an "HMO contract offered by a health insurance issuer" and "health insurance issuer" as including HMOs).

OPM's contract with the Plan thus is similar to the contract at issue in

*Bridgeport Hospital*. There, Blue Cross contracted with OPM to provide health

insurance benefits for federal employees, and Blue Cross in turn contracted to pay

Bridgeport Hospital for services provided to federal employees. 2003 WL 244810,

at *1-2. OFCCP argued that Bridgeport Hospital should be subject to DOL's

affirmative action scheme because the hospital was providing a service "necessary

to" fulfill Blue Cross's contract with OPM. *Id.* at *2. According to OFCCP in

*Bridgeport*,

> The heart of Blue's contract with OPM is that it agrees to
> provide Federal employees who enroll with a list of
> medical services, which are to be performed by health
> care facilities . . . . The periodic payments to Blue (made
> by Federal enrollees and the Government) to maintain
> access to these medical services and benefits would be
> rendered meaningless if Blue could not deliver a facility
> that would perform the medical services listed in the
> brochure.

*Id.* at *3 (omission in original). The ARB rejected this argument because insurers

like Blue Cross do not provide medical care. *See id.* at *3-4.

Here, the Plan does not provide medical care either. It is undisputed that the

Plan itself is not a direct medical care provider. That is why the Plan had

contracted with the Hospitals years before the Plan ever entered into an agreement

with OPM. JA 59. The Plan issues insurance cards to federal employees who then

use those cards to procure healthcare services from any of the hospitals and

medical providers with which the Plan has contracted, including the Hospitals.  JA

159.  OFCCP is making the same argument here that it made unsuccessfully in

*Bridgeport*, that the Plan/OPM contract would be meaningless without

subcontracts to provide federal employees actual health care.  But the Plan/OPM

contract is not meaningless on its own.  For OPM, it is but one avenue, like

traditional insurance, to provide federal employees with access to health care.

The ARB's finding that the Plan is "primarily" a healthcare provider and not

"strictly" an insurer is not supportable.  In stating that the Plan is "primarily" a

healthcare provider, the ARB did not account for the role of HMOs in the FEHBP.

HMOs are a specific part of OPM's plan to provide a variety of healthcare access

choices to federal employees.  It is OPM's expressly stated goal to increase HMO

participation in FEHBP and to eliminate barriers and disincentives to

participation.[16]  OPM has modified the FEHBAR many times over the years to

accommodate issues and concerns related to HMOs.[17]  OPM clearly intends that

---

[16] *See* OPM, *Healthcare–Carriers*, *Note*, http://www.opm.gov/healthcare-insurance/healthcare/carriers/ (last visited Sept. 12, 2013) (stating that OPM "would like to expand nationwide the number of health maintenance organizations (HMO) available" in the FEHBP and encouraging them to apply); 76 Fed. Reg. at 38,284 (noting the decline in the number of HMOs participating in the FEHBP and stating that OPM is "taking steps to mitigate risks and eliminate barriers to entry" to help increase the choices in "health insurance plans").

[17] *See*, *e.g.*, 62 Fed. Reg. 47,569, 47,570, 47,573 (Sept. 10, 1997); 55 Fed. Reg. at 27,406, 27,413; 54 Fed. Reg. 43,089, 43,089-90 (Oct. 20, 1989).

HMOs be part of the FEHBP in the same way as other kinds of carriers, without having special burdens placed on them. Subjecting HMOs alone to the administrative burdens of complying with the affirmative action scheme would decrease the incentive for HMOs to join the program and upset OPM's scheme and goals.

The ARB's logic is also flawed because it seems to equate not being "strictly" an insurer with being "primarily" a healthcare provider. This misconstrues the insurance aspect of HMOs like the Plan. HMOs undisputedly have insurance components and are treated as insurers for some purposes.[18] Of course, HMOs and traditional insurers are not identical, but their distinctions have no bearing on whether they should be treated the same way for subcontractor

---

[18] *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 372-73, 375, 387 (2002) (holding that state HMO statute was a law "regulating insurance" and not preempted by ERISA, stating that "HMOs have taken over much business formerly performed by traditional indemnity insurers, and they are almost universally regulated as insurers under state law. That HMOs are not traditional 'indemnity' insurers is no matter."); *Express Scripts, Inc. v. Wenzel*, 262 F.3d 829, 832, 835, 838 (8th Cir. 2001) (accepting the Secretary of Labor's argument that HMOs "are in the business of insurance" and "agree[ing] with other circuit courts which have concluded that HMOs are insurers" in concluding that state HMO statute was saved from ERISA preemption); *In re Estate of Medcare HMO*, 998 F.2d 436, 444 (7th Cir. 1993) (holding that an HMO is an insurer for purposes of the Bankruptcy Code); 45 C.F.R. §§ 800.10, 800.20 (treating HMOs as health insurance providers under the Affordable Care Act); *see also* 40 PA. STAT. §§ 1551-67 (Pennsylvania established HMOs pursuant to insurance statute, and HMOs are regulated in part by the Insurance Commissioner).

purposes under FEHBAR. "Two entities need not be identical to be classified together for a particular purpose." *Medcare*, 998 F.2d at 444.

There is no logical reason, in the context of OPM's purpose and regulation, to distinguish between HMOs and traditional health insurance arrangements like Blue Cross. In either case, OPM is fulfilling its goal of providing a choice in healthcare access options to federal employees, and OPM should have the right to make those choices and administer its program without being thwarted by another agency or the courts. It makes no sense for the Hospitals here to be subject to the affirmative action scheme because they contracted with an HMO, while Bridgeport Hospital is not subject to that scheme because it contracted with a traditional insurer. In both cases, federal employees are receiving health benefits pursuant to the FEHBP. It is much more logical to treat all of these insuring-type entities the same, as they perform the same function in the FEHBP, rather than making HMO participation uniquely burdensome.

### D. OFCCP's Attempts At Overreaching Its Authority And Regulating FEHBP Healthcare Providers Should Be Rejected.

Research has revealed no challenge to OPM's exclusion of medical services providers as subcontractors until now. OFCCP's interest in aggressively seeking to apply the affirmative action scheme to medical providers contracting with OPM contractors in the FEHBP appears to be a recent phenomenon.

Shortly after OFCCP lost in *Bridgeport* in 2003, it issued Policy Directive 262. This Directive's purpose was "[t]o confirm that health care providers having a relationship with FEHBP participants are not covered under OFCCP's programs based solely on that relationship." OFCCP, *Policy Directive 262* (Mar. 17, 2003), http://www.dol.gov/ofccp/regs/compliance/directives/dir262.pdf. The directive then explained the *Bridgeport* decision and stated that the Office of the Solicitor "advised that OFCCP cannot establish subcontractor coverage of hospitals, pharmacies or other medical care providers based on the existence of prime contracts with Blue Cross or other FEHBP providers." *Id.* It concluded by stating, "Based on the ARB decision, OFCCP cannot use FEHBP coverage as a basis to assert jurisdiction over a health care provider." *Id.*

About a year later, however, OFCCP issued scheduling letters to the Hospitals and then about three years later to the Florida hospital at issue in *In re Florida Hospital of Orlando*. *See* AR 1071-90; *Fla. Hosp.*, 2013 WL 3981196, at *5. After a favorable ALJ ruling in *Florida Hospital* in which the ALJ concluded that the Florida hospital was subject to OFCCP regulation as a federal subcontractor, OFCCP repealed Policy Directive 262 in December 2010 and replaced it with Policy Directive 293. OFCCP, *Policy Directive 293* (Dec. 16, 2010), http://www.healthcareemploymentcounsel.com/examining-room/OFCCPDirective293.pdf. Policy Directive 293 contains an extended

36

discussion of the kinds of medical providers that OFCCP considers to be

subcontractors and therefore bound by the affirmative action scheme.  After the

ARB reversed the ALJ in *Florida Hospital* and a law was passed affecting the

particular military healthcare program at issue in that case, OFCCP announced that

it was rescinding Policy Directive 293 in light of "recent legislation and related

developments in pending litigation."  *See* OFCCP, *Policy Directive 301* (Apr. 25,

2012), http://www.dol.gov/ofccp/regs/compliance/ directives/dir301.pdf.  OFCCP

issued a new directive, Policy Directive 301, stating that OFCCP would make

determinations about whether it contends it has regulatory jurisdiction over a

particular subcontractor on a case-by-case basis.  *Id.*

Congress gave OPM the authority to implement regulations for the FEHBP,

and OPM did so in the regulation that excluded medical providers as

subcontractors.  Under OPM's regulation, medical providers in the FEHBP

program are not subject to OFCCP regulatory jurisdiction.  OFCCP's aggressive

attempt to expand its jurisdiction to cover direct medical providers in the FEHBP

based on their relationship with OPM contractors that happen to be HMOs should

be rejected.

## II.    OFCCP LACKS STATUTORY AUTHORITY TO SUBJECT THE HOSPITALS TO THE AFFIRMATIVE ACTION SCHEME REGARDING WOMEN AND MINORITIES.

Executive Order 11246 prohibits federal contractors from discriminating on the basis of, *inter alia*, race, sex, and national origin against their employees and employment applicants.  DOL's regulation goes significantly further, however, and requires federal contractors to establish complex, costly and temporally unlimited affirmative action programs for women and minorities.  *See* 41 C.F.R. §§ 60-1.4, 60-1.40.  DOL has no statutory authority to subject the Hospitals to such affirmative action requirements.

Statutory authority is critical because agencies' "power to act and how they are to act is authoritatively prescribed by Congress."  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).  Courts must "tak[e] seriously, and apply[] rigorously, in all cases, statutory limits on agencies' authority.  Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow."  *Id.* at 1874.  Accordingly, the question "is always whether the agency has gone beyond what Congress has permitted it to do."  *Id.* at 1869.

In this case, DOL cannot meet its burden of demonstrating a statutory authorization for subjecting the Hospitals to the affirmative action scheme, because

38

Congress did not directly authorize the regulations and because any suggestion that

the regulations are implicitly authorized is without merit.

### A.   Congress Has Not Directly Authorized OFCCP's Affirmative Action Regulations Regarding Women And Minorities.

The Supreme Court addressed the question of statutory authorization for

OFCCP's EO 11246 regulations in *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979).

In *Chrysler*, the Court explained:

> Section 201 of Executive Order 11246 directs the Secretary of Labor to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof."  But in order for such regulations to have the "force and effect of law," it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress.

*Id.* at 304.  The Court announced the pertinent standard of review:  "What is

important is that the reviewing court reasonably be able to conclude that the grant

of authority contemplates the regulations issued."  *Id.* at 308.[19]

Here, DOL can point to no statute that authorizes the OFCCP affirmative

action scheme regarding women and minorities.  Indeed, the Supreme Court

explained that the statutory authorization for EO 11246—the basis for the OFCCP

regulations requiring affirmative action for women and minorities—is "obscure."

---

[19]  In *Chrysler*, the Court concluded that OFCCP's public disclosure regulations were not reasonably within the contemplation of any of the arguable statutory bases of authority.  441 U.S. at 308.

*Chrysler*, 441 U.S. at 303. This is in stark contrast to the express statutory

authorization of affirmative action in employment for qualified individuals with

disabilities and covered veterans.[20] There is no such direct statutory authorization

for OFCCP's affirmative action scheme regarding women and minorities.

### B.    Neither Title VII Nor The Property Act Provides Implicit Authority For The OFCCP Affirmative Action Scheme For Women And Minorities.

DOL argued below that the Federal Property and Administrative Services

Act of 1949 ("the Property Act"), 40 U.S.C. § 101, *et seq*., and Title VII implicitly

authorized the OFCCP affirmative action scheme. Dist. Ct. Dkt. No. 16-1 (ECF)

at 18-19. It contended that because EO 11246 is "consistent with" the Property

Act's prohibition of sex discrimination in programs receiving federal assistance

and Title VII's prohibition of sex and race discrimination in employment, EO

11246 is adequately rooted in congressional authority. *Id.* Given the broad

delegation of authority to the Secretary under EO 11246, so argues DOL, its

---

[20]  *See* 29 U.S.C. § 793(a) ("Any contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities."); 38 U.S.C. § 4212(a)(1) ("Any contract in the amount of $100,000 or more entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States take affirmative action to employ and advance in employment qualified covered veterans.").

affirmative action regulations are authorized under the same rationale.  This

argument is without merit for several reasons.

### 1.    DOL's Implicit Authority Arguments Are Not Entitled To Deference.

DOL has taken no official agency position on its authority to issue the

affirmative action scheme regarding women and minorities.  The ARB did not

address the point because it ruled that it lacked jurisdiction to entertain questions

about the statutory basis for OFCCP's jurisdiction over the Hospitals.  JA 54 ("The

Board, however, does not 'have jurisdiction to pass on the validity of any portion

of the Code of Federal Regulations which has been duly promulgated by the

Department of Labor and shall observe the provisions thereof, where pertinent, in

its decisions.'" (quoting Secretary's Order 1-2002, 67 Fed. Reg. 64,272 (Oct. 17,

2002))).  Nor do the regulations themselves contain any interpretation of any

statute as the authorization for an affirmative action program regarding women and

minorities.[21]

---

[21]  Although the President delegated authority to the Secretary of Labor to interpret
EO 11246, the Executive Order does not itself contain any substantive
interpretation of any statute, nor does it identify the statutory basis for the issuance
of the Order.  *See Chrysler*, 441 U.S. at 304 n.33 (noting that "The Executive
Order itself merely states that it is promulgated '[u]nder and by virtue of the
authority vested in [the] President of the United States by the Constitution and
statutes of the United States.'" (citations omitted)).  No specific provision is
identified.  In the district court, the DOL asserted that the Property Act authorized
EO 11246.  Dist. Ct. Dkt. No. 16-1 (ECF) at 18-19.  The Property Act authorizes

DOL has taken positions—discussed in detail below—in this litigation.  But the question is not whether DOL supports OFCCP's position.  The critical issue is the identification and interpretation of federal statutory provisions that allegedly provide authority for agency action.  In appropriate circumstances, an agency may be entitled to *Chevron* deference with regard to its interpretation of ambiguous statutory terms regarding the agency's authority.  *See Arlington*, 131 S. Ct. at 1872-73.  Such deference can be given, however, only to an agency's interpretation of a statute or other authoritative text, not to policies or litigation "positions."  DOL's arguments in its litigation filings in this case plainly are not entitled to *Chevron* deference.  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (holding *Chevron* deference appropriate only "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("We have never applied the principle of [*Chevron* deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice."); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650,

the President to "prescribe policies and directives . . . necessary to carry out" the Property Act to the extent that the policies are "consistent" with the Act.  40 U.S.C. § 121(a).  There is no indication, however, that the President delegated authority to interpret the Property Act to the Secretary of Labor or that any specific Property Act provision authorizes the OFCCP affirmative action program.

660 (D.C. Cir. 2011) ("[W]e give no deference to agency 'litigating positions' raised for the first time on judicial review.").

Moreover, part of DOL's implicit authorization argument relies on its interpretation of Title VII, but DOL has no authority to interpret Title VII.  Even the EEOC, the independent agency created by Title VII to enforce the law, has no authority to render substantive interpretations of Title VII.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U. S. 101, 110 n.6 (2002) ("But we have held that EEOC's interpretive guidelines do not receive *Chevron* deference." (citing *EEOC v. Arabian Am. Oil Co*., 499 U.S. 244, 257 (1991))).  Neither the President nor DOL is delegated any power to interpret Title VII.

Accordingly, there is no basis for deferring to DOL's litigation position in this case.

### 2.    Basic Principles Of Statutory Construction Militate Against Any Implicit Statutory Authority Arguments.

In both the Rehabilitation Act and VEVRAA, Congress specifically provided for affirmative action programs to cover the groups protected by those statutes, namely, qualified individuals with a disability and covered veterans.  *See* 29 U.S.C. § 793(a); 38 U.S.C. § 4212(a)(1).  The fact that Congress expressly provided for affirmative action for those individuals but did not so provide in either Title VII or the Property Act strongly indicates that Congress did not intend routine affirmative action programs for the minorities and women addressed in EO 11246.

43

*See Arlington*, 133 S. Ct. at 1868 ("Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation, internal quotation marks, and alteration omitted)).

### 3. Title VII Does Not Implicitly Authorize OFCCP's Affirmative Action Scheme.

DOL's suggestion that Title VII's prohibition of sex and race discrimination in employment implicitly authorizes the OFCCP affirmative action scheme is without merit. In *Chrysler*, the Supreme Court rejected the assertion that Title VII authorized EO 11246 because Title VII does not contain any "express substantive delegation to the President." 441 U.S. at 305 n.35.[22] Moreover, non-discrimination and affirmative action are distinct concepts. Title VII prohibits employment discrimination but does not require employers to engage in affirmative action in employment, except as a remedy based on a judicial finding of intentional discrimination. *See* 42 U.S.C. § 2000e-5(g)(1); *Local 28 Int'l Ass'n*

---

[22]  It would be anomalous to interpret Title VII as implicitly authorizing OFCCP to issue affirmative action regulations when Congress *precluded* the EEOC from issuing regulations addressing substantive requirements under Title VII. *See Morgan*, 536 U. S. at 110 n.6.

*Sheet Metal Workers v. EEOC*, 478 U.S. 421, 476 (1986) (approving use of racial preferences only where necessary to remedy past discrimination).  By contrast, the affirmative action scheme here is based only on a predicate of a bottom-line statistical imbalance.  Title VII expressly precludes drawing a connection between discrimination and affirmative action based on statistical imbalances.[23]  Thus, there is no support for the argument that Title VII's anti-discrimination provision implicitly authorizes the OFCCP affirmative action scheme.

### 4. The Property Act Does Not Authorize The Affirmative Action Scheme.

DOL's assertion that the Property Act implicitly authorizes the affirmative action scheme also fails, for several reasons:  (1) a provision of the Property Act referencing sex discrimination does not authorize affirmative action, (2) there is no reasonable nexus in this case between the imposition of the affirmative action scheme on the Hospitals and the Property Act's general purpose of "an economical and efficient system for procurement and supply," 40 U.S.C. § 121, note 9, and (3) DOL's argument for authorization of affirmative action on behalf of women and

---

[23]  *See* 42 U.S.C. § 2000e-2(j); *see also Ricci*, 557 U.S. at 582 ("[A]n employer could discard test results (or other employment practices) with the intent of obtaining the employer's preferred racial balance.  That operational principle could not be justified, for Title VII is express in disclaiming any interpretation of its requirements as calling for outright racial balancing." (citing 42 U.S.C. § 2000e-2(j))).

minorities raises serious constitutional problems that should be avoided by

rejecting DOL's version of the Property Act.

> **a.    The Property Act's Reference To Sex Discrimination Does Not Authorize OFCCP's Affirmative Action Scheme.**

DOL's first argument regarding implicit authorization from the Property Act

relies on a 1976 amendment to the Act, which provides:

> (a) Prohibition.—With respect to a program or activity carried on or receiving federal assistance under this subtitle, an individual may not be excluded from participation, denied benefits, or otherwise discriminated against based on sex.

> (b) Enforcement.—Subsection (a) shall be enforced through agency provisions and rules similar to those already established with respect to racial and other discrimination under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq*.).  However, this remedy is not exclusive and does not prejudice or remove any other legal remedies available to an individual alleging discrimination.

40 U.S.C. § 122 (hereinafter, "Section 122").

Section 122 plainly does not support DOL's argument for at least four

reasons.  *First*, Section 122 does not mention affirmative action.  Although

Section 122 precludes discrimination "based on sex," it is well-established, as

explained above, that affirmative action and non-discrimination are distinct

concepts.  Accordingly, there is no reasonable connection between the affirmative

action scheme and Section 122's provision regarding sex discrimination.[24]

    *Second*, Section 122 mentions only sex discrimination and does not contain

any provision regarding unlawful discrimination on the basis of race, color, or

national origin.  Section 122 cites Title VI of the Civil Rights Act of 1964, which

prohibits race, color, and national origin discrimination in programs receiving

federal financial assistance.  42 U.S.C. § 2000d.  Even if Section 122's reference to

Title VI could be said, by some strained reading, to incorporate the Title VI

prohibition on race and other varieties of discrimination into Section 122, this still

would provide no support for the affirmative action scheme.  Like Title VII, Title

VI does not require affirmative action except as a remedy for prior, intentional

discrimination.  *See United States v. Fordice*, 505 U.S. 717, 732 n.6, n.7 (1992)

(holding that "the reach of Title VI's protection extends no further than the

Fourteenth Amendment," which reaches only intentional discrimination).  Indeed,

the Supreme Court has held expressly that Title VI does not authorize EO 11246 or

the OFCCP affirmative action scheme.  *Chrysler*, 442 U.S. at 305 n.35 (holding

that Title VI does not authorize EO 11246 because it contains no provision for

---

[24]  As discussed above, the Hospitals are already subject to the non-discrimination
requirements of Title VII as well as state and local law, which coincide exactly
with the non-discrimination requirements of EO 11246.

congressional review as required by 42 U.S.C. § 2000d-1).[25]  Title VI does not

even apply to employment discrimination unless the primary objective of the

federal financial assistance is to provide employment.  *See* 42 U.S.C. § 2000d-3;

*Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 (10th Cir. 1995); *Thornton v.*

*Nat'l R.R. Passenger Corp.*, 16 F. Supp. 2d 5, 7 (D.D.C. 1998).  Certainly, the

Secretary can make no argument that a "primary objective" of the FEHBP is the

employment of hospital workers.  Accordingly, the reference to Title VI in this

statutory provision does not authorize the affirmative action scheme.

 *Third*, Section 122 makes no mention of the Secretary of Labor or the

President and instead vests enforcement authority in the various federal agencies

under the scheme already established under Title VI.  *See* 40 U.S.C. § 122(b).

Under Title VI, "[e]ach Federal department and agency . . . is authorized and

directed to effectuate the provisions of [Title VI] . . . by issuing rules, regulations

and orders of general applicability."  42 U.S.C. § 2000d-1.  Section 122's express

delegation of authority to "each Federal department and agency" cannot be

reconciled with DOL's position in this case, because OPM's regulation specifically

---

[25]  In *Chrysler*, the Court noted that, far from authorizing OFCCP's actions, "the question has usually been put in terms of whether Executive Order 11246 is inconsistent with [Titles VI and VII] of the Civil Rights Act of 1964."  441 U.S. at 305 n.35; *see also United States v. Trucking Mgmt., Inc.*, 662 F.2d 36, 43-45 (D.C. Cir. 1981) (rejecting OFCCP's attempt to interpret EO 11246 to challenge bona fide seniority systems that perpetuated prior discrimination because the interpretation is contrary to Title VII).

*excludes* the Hospitals from the definition of subcontractor.  *See* 48 C.F.R.

§ 1602.170-15.

*Fourth*, Section 122 expressly applies to recipients of federal financial

assistance; federal contractors do not fall into that category.  *See Partridge v.*

*Reich*, 141 F.3d 920, 925-26 (9th Cir. 1998); *OFCCP v. USAA Fed. Sav. Bank*, 87-

OFC-27 (ALJ Oct. 4, 1990) (OFCCP stipulated that "Federal financial assistance

agreements within the meaning of [Title VI] are not government contracts within

the coverage of the Executive Order").[26]  Procurement contracts are not considered

federal financial assistance.  *See Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1335

(11th Cir. 2005); *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421-22 (4th Cir.

2005); *DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1382-83

(10th Cir. 1990); *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir.

1984).

For all of those reasons, the Secretary's argument that Section 122

authorizes the affirmative action scheme is incorrect.

---

[26]  *Available at* http://www.oalj.dol.gov/PUBLIC/OFCCP/DECISIONS/
ALJ_DECISIONS/OFC/9010USAA_TXT.HTM#.

### b. There Is No Record Evidence Of A Reasonably Close Nexus Between OFCCP's Affirmative Action Scheme And The Property Act's Purpose Of Economy And Efficiency In Procurement.

The Property Act authorizes the President to "'prescribe policies and directives . . . to effectuate'" the Act's goal of "'an economical and efficient system . . . for procurement and supply.'"  *AFL-CIO v. Kahn*, 618 F.2d 784, 788, 788 n.20 (D.C. Cir. 1979) (quoting 40 U.S.C. §§ 471, 486(a) (currently codified at 40 U.S.C. §§ 101, 121)).  For the affirmative action regulations to have the force of law, DOL must show a nexus between the regulations and the statutory delegation of authority, so as to establish that the congressional grant of authority reasonably contemplated the regulation.  *See Chrysler*, 441 U.S. at 304, 308.  No such nexus exists here.

Several courts have addressed the argument that the Property Act provides a statutory authorization for OFCCP action imposing obligations on particular employers or industry sectors.  The Supreme Court appeared to be skeptical of the argument that the Property Act authorizes the non-discrimination provisions of EO 11246, pointing out that the Property Act nowhere expressly refers to employment discrimination.  *Chrysler*, 441 U.S. at 308.  The Court did not resolve the question but observed that the statutory grounds for EO 11246 are "obscure." *Id.* at 304.

Two courts of appeals have addressed the Property Act argument directly. The Third Circuit found statutory authorization in the Property Act for OFCCP's 1969 Philadelphia Plan because that affirmative action order involved "one area in which discrimination in employment was most likely to affect the cost and progress of projects in which the federal government had both financial and completion interests." *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 171 (3d Cir. 1971). The court explained that "[i]n direct procurement the federal government has a vital interest in assuring that the largest pool of qualified manpower be available for accomplishment of its projects." *Id.* The court found significant that OFCCP made findings of "obvious underrepresentation [ ] due to the exclusionary practices of the unions representing the six trades." *Id.* at 173.

By contrast, in *Liberty Mutual*, the Fourth Circuit ruled that the OFCCP order was invalid because there were no administrative findings of a "reasonably close nexus" between efficient government procurement and OFCCP jurisdiction over subcontactors who provided workers compensation insurance to prime federal contractors. 639 F.2d at 170-71. The court noted, for example, that "there is no suggestion that insurers have practiced deliberate exclusion of minority employees." *Id.* at 171.

The analysis prescribed by these cases forecloses DOL's argument that subcontractor jurisdiction over the Hospitals is within the reasonable

51

contemplation of the Property Act. This is so for at least two reasons. *First*, there is no record evidence in this case regarding exclusionary practices or underrepresentation of women or minorities in the workforces of hospitals that are reimbursed through the FEHBP. In *Contractors Ass'n*, OFCCP's finding of "obvious underrepresentation" attributable to "exclusionary practices" was critical to the Third Circuit's holding that the Property Act authorized the specific affirmative action order at issue there. 442 F.2d at 173. Where such findings regarding "deliberate exclusion of minority employees" by workers' compensation insurers were absent, however—as they are with respect to the Hospitals in this case—the Fourth Circuit rejected any claimed Property Act authorization for subcontractor jurisdiction over such insurers. *Liberty Mut.*, 639 F.2d at 170-71. The lack of such findings or record evidence of exclusionary practices here is fatal to DOL's position.

*Second*, the application of the affirmative action regulations to alleged subcontractors like the Hospitals does not involve direct procurement. The Third Circuit deemed direct procurement to be vital to finding a requisite connection between the OFCCP's affirmative action order and the Property Act's economy and efficiency goals. *Contractors Ass'n*, 442 F.2d at 173. Likewise, the Fourth Circuit found the lack of direct procurement to be an important consideration

52

against authorization in the Property Act for OFCCP's jurisdiction over workers' compensation insurers.  *Liberty Mut.*, 639 F.2d at 171.

In sum, there is no record evidence establishing a reasonably close nexus between the imposition of OFCCP affirmative action regulations on the Hospitals and economy and efficient in government contracting.  Accordingly, the Secretary's Property Act argument cannot sustain OFCCP's assertion of regulatory authority in this case.

> **c.     Implicit Authorization Of OFCCP's Affirmative Action Scheme Mandates An Interpretation Of The Property Act That Raises Serious Constitutional Problems.**

It is well-established that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such a construction is plainly contrary to the intent of Congress."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *accord*, *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1340 (D.C. Cir. 2002) ("Although we normally defer to an agency's interpretation of ambiguous statutory language under [*Chevron*], here another even more important principle of judicial restraint weighs upon us, which is that Federal courts traditionally have sought to avoid constitutional questions if at all possible." (internal quotation marks omitted)); *Chamber of Comm. of the U.S.A. v. FCC*, 69 F.3d 600, 605 (D.C. Cir. 1995) ("We are obliged to construe the

statute to avoid constitutional difficulties if such a construction is not plainly

contrary to the intent of Congress.").

"[O]ne of the canon's chief justifications is that it allows courts to avoid the

decision of constitutional questions.  It is a tool for choosing between competing

plausible interpretations of a statutory text, resting on the reasonable presumption

that Congress did not intend the alternative which raises serious constitutional

doubts." *Clark v. Martinez*, 541 U.S. 371, 381 (2005).  Here, DOL advances an

interpretation of the Property Act that mandates affirmative action in employment

on behalf of women and minorities.  Because such an interpretation raises serious

constitutional doubts, it runs afoul of the longstanding doctrine of constitutional

avoidance.

The affirmative action scheme at issue here requires federal contractors and

subcontractors to develop written AAPs for racial minorities and women, but not

for anyone else.   Although EO 11246 provides that "[t]he contractor will take

affirmative action to ensure that applicants are employed, and that employees are

treated during employment, *without regard to their race, color, religion, sex, or

national origin*" (EO 11246, at § 202(1) (emphasis added)), OFCCP has issued

affirmative action regulations that apply only to women and certain minorities and,

far from requiring affirmative action "without regard to . . .  race and . . . sex,"

actually require specific benchmarking and targeted outreach expressly on the

basis of race and sex for specified races and women alone.   As the Supreme Court

recently emphasized, "[d]istinctions between citizens solely because of their

ancestry are by their very nature odious to a free people, and therefore are contrary

to our traditions and hence constitutionally suspect."  *Fisher v. Univ. of Tex.*, 133

S. Ct. 2411, 2418 (2013) (citations and internal quotation marks omitted).

Accordingly, racial classifications such as the affirmative action scheme are

subject to strict judicial scrutiny.  *See Adarand Constructors, Inc. v. Pena*, 515

U.S. 200, 224 (1995); *MD/DC/DE Broadcasters*, 236 F.3d at 22. [27]

To satisfy strict scrutiny, the affirmative action scheme would have to be

justified by a "compelling governmental interest" and be "narrowly tailored" to

further the compelling governmental interest.  *Adarand Constructors,* 515 U.S.

at 235.  OFCCP could be justified in ordering affirmative action on behalf of racial

minorities based on adequate findings of prior "deliberate exclusionary practices,"

i.e., intentional discrimination, by a particular employer.  *See id.* at 237;

*MD/DC/DE Broadcasters*, 236 F.3d at 21-22.  In this case, however, OFCCP has

---

[27]  In addition to requiring contractors to develop affirmative action programs,
OFCCP targets contractors for burdensome compliance audits where their
workforce demographics do not meet statistical racial and gender balances.  In
particular, OFCCP selects contractor-establishments for these compliance audits
based on an analysis of the percentage of women and minorities in an employer's
workforce, as reported in annual EEO-1 reports filed by employers.  The EEO-1
report is "central to OFCCP's ability to identify and select federal contractors for
compliance evaluations and to assess a contractor's equal employment opportunity
trends."  Final S&S 14.

made no such findings with regard to the Hospitals or any other healthcare employers. Indeed, the affirmative action scheme mandates that employers engage in affirmative action based solely on statistical imbalances that fall far short of a finding of prior unlawful discrimination.[28]

In addition, the affirmative action scheme would have to be narrowly tailored to redress the intentionally exclusionary practices. *Adarand Constructors,* 515 U.S. at 237. There is grave doubt whether the affirmative action scheme could meet that test, because it mandates affirmative action without first considering race-neutral alternatives, requires affirmative action across all locations and job categories—even those for which there have been no findings of deliberately exclusionary practices—and imposes an obligation that has no temporal end-point

---

[28] The statistical availability analysis and placement goals central to OFCCP's affirmative action scheme, *see* 41 C.F.R. § 60-2.10 ("A central premise underlying affirmative action is that, absent discrimination, over time a contractor's workforce, generally, will reflect the gender, racial and ethnic profile of the labor pools from which the contractor recruits and selects."), are nearly identical to aspects of the FCC affirmative action regulations that this Court found to violate the Equal Protection Clause. *See MD/DC/DE Broadcasters*, 236 F.3d at 22 ("The race of each job applicant is relevant to the prevention of discrimination only if the Commission assumes that minority groups will respond to non-discriminatory recruitment efforts in some predetermined ratio, such as in proportion to their percentage representation in the local workforce. Any such assumption stands in direct opposition to the guarantee of equal protection, however."); *see also Lutheran Church–Mo. Synod v. FCC*, 154 F.3d 487, 492 (D.C. Cir. 1998) ("The imposition of numerical norms based on proportional representation—which is the core element to what are often referred to as affirmative action, set aside, or quota programs—is the aspect of the Commission's rule that makes it impossible for us to apply any standard of review other than strict scrutiny.").

but exists whenever a statistical racial imbalance re-emerges.[29]  This very case

illustrates the point:  here OFCCP has made no findings with regard to the

Hospitals or the healthcare sector generally from which the agency could even

begin to make an argument that the affirmative action scheme is narrowly tailored

in this context.

Accordingly, DOL's arguments for the affirmative action scheme would

raise serious constitutional problems, which should be avoided by a proper

construction of the Property Act and Title VII as not authorizing OFCCP's

assertion of jurisdiction as to the Hospitals in this case.

## **CONCLUSION**

The judgment of the district court and the decision of the ARB should be

reversed, and OFCCP's effort to assert regulatory authority over the Hospitals

should be rejected.

---

[29]  *See Adarand Constructors*, 515 U.S. at 237-38 (narrow tailoring requires
"consideration of the use of race-neutral means" and requires that the program "not
last longer than the discriminatory effects it is designed to eliminate" (citations and
internal quotation marks omitted)); *MD/DC/DE Broadcasters*, 236 F.3d at 21-22
("Option B places pressure upon each broadcaster to recruit minorities without a
predicate finding that the particular broadcaster discriminated in the past or
reasonably could be expected to do so in the future.  Quite apart from the question
of a compelling governmental interest, such a sweeping requirement is the
antithesis of [a] rule narrowly tailored to meet a real problem.").

Respectfully submitted,

John J. Myers
Ryan J. Siciliano
ECKERT SEAMANS CHERIN &
    MELLOT, LLC
US Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219-2788
412 566-6000
jmyers@eckertseamans.com

September 13, 2013

  /s/ *Peter Buscemi*          
Peter Buscemi
William E. Doyle, Jr.
David M. Kerr
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
202 739-5190
pbuscemi@morganlewis.com

D'Andra Millsap Shu
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana, Suite 4000
Houston, Texas 77002
713 890-5000

*Attorneys for Appellants*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7), I certify that this brief complies with the applicable type-volume word count option limitations with 13,422 words.  This certificate was prepared in reliance on the word count of Microsoft Office Word used to prepare this brief.

 /s/ *Peter Buscemi*        
Peter Buscemi

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2013, a copy of the foregoing Final

Brief of Appellants was filed electronically on the Court's CM/ECF system.  I

understand that by operation of the Court's electronic filing system notice of this

filing will be sent to all registered parties.  Parties may access this filing through

the Court's system.

 /s/ *Peter Buscemi*          
Peter Buscemi

# ADDENDUM

# ADDENDUM—PERTINENT STATUTES AND REGULATIONS

## I.     Executive Order 11246

### Executive Order 11246 — Equal Employment Opportunity

SOURCE: The provisions of Executive Order 11246 of Sept. 24, 1965, appear at 30 FR 12319, 12935, 3 CFR, 1964-1965 Comp., p.339, unless otherwise noted.

Under and by virtue of the authority vested in me as President of the United States by the Constitution and statutes of the United States, it is ordered as follows:

### Part I—Nondiscrimination in Government Employment

[Part I superseded by EO 11478 of Aug. 8, 1969, 34 FR 12985, 3 CFR, 1966-1970 Comp., p. 803]

### Part II—Nondiscrimination in Employment by Government Contractors and Subcontractors

### Subpart A—Duties of the Secretary of Labor

**SEC. 201.** The Secretary of Labor shall be responsible for the administration and enforcement of Parts II and III of this Order. The Secretary shall adopt such rules and regulations and issue such orders as are deemed necessary and appropriate to achieve the purposes of Parts II and III of this Order.

[Sec. 201 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, l978 Comp., p. 230]

### Subpart B—Contractors' Agreements

**SEC. 202.** Except in contracts exempted in accordance with Section 204 of this Order, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

During the performance of this contract, the contractor agrees as follows:

1.     The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure

that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause.

2.     The contractor will, in all solicitations or advancements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

3.     The contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

4.     The contractor will comply with all provisions of Executive Order No. 11246 of Sept. 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

5.     The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

6.     In the event of the contractor's noncompliance with the nondiscrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated, or suspended in whole or in part and the contractor may be declared

ineligible for further Government contracts in accordance with procedures authorized in Executive Order No. 11246 of Sept. 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

7.    The contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as may be directed by the Secretary of Labor as a means of enforcing such provisions including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction, the contractor may request the United States to enter into such litigation to protect the interests of the United States." [Sec. 202 amended by EO 11375 of Oct. 13, 1967, 32 FR 14303, 3 CFR, 1966-1970 Comp., p. 684, EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

## SEC. 203.

a.    Each contractor having a contract containing the provisions prescribed in Section 202 shall file, and shall cause each of his subcontractors to file, Compliance Reports with the contracting agency or the Secretary of Labor as may be directed. Compliance Reports shall be filed within such times and shall contain such information as to the practices, policies, programs, and employment policies, programs, and employment statistics of the contractor and each subcontractor, and shall be in such form, as the Secretary of Labor may prescribe.

b.    Bidders or prospective contractors or subcontractors may be required to state whether they have participated in any previous contract subject to the provisions of this Order, or any preceding similar Executive order, and in that event to submit, on behalf of themselves and their proposed subcontractors, Compliance Reports prior to or as an initial part of their bid or negotiation of a contract.

Add. 3

c.     Whenever the contractor or subcontractor has a collective bargaining agreement or other contract or understanding with a labor union or an agency referring workers or providing or supervising apprenticeship or training for such workers, the Compliance Report shall include such information as to such labor union's or agency's practices and policies affecting compliance as the Secretary of Labor may prescribe: Provided, That to the extent such information is within the exclusive possession of a labor union or an agency referring workers or providing or supervising apprenticeship or training and such labor union or agency shall refuse to furnish such information to the contractor, the contractor shall so certify to the Secretary of Labor as part of its Compliance Report and shall set forth what efforts he has made to obtain such information.

d.     The Secretary of Labor may direct that any bidder or prospective contractor or subcontractor shall submit, as part of his Compliance Report, a statement in writing, signed by an authorized officer or agent on behalf of any labor union or any agency referring workers or providing or supervising apprenticeship or other training, with which the bidder or prospective contractor deals, with supporting information, to the effect that the signer's practices and policies do not discriminate on the grounds of race, color, religion, sex or national origin, and that the signer either will affirmatively cooperate in the implementation of the policy and provisions of this Order or that it consents and agrees that recruitment, employment, and the terms and conditions of employment under the proposed contract shall be in accordance with the purposes and provisions of the order. In the event that the union, or the agency shall refuse to execute such a statement, the Compliance Report shall so certify and set forth what efforts have been made to secure such a statement and such additional factual material as the Secretary of Labor may require.

[Sec. 203 amended by EO 11375 of Oct. 13, 1967, 32 FR 14303, 3 CFR, 1966-1970 Comp., p. 684; EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

## SEC. 204

a.     The Secretary of Labor may, when the Secretary deems that special circumstances in the national interest so require, exempt a contracting agency from the requirement of including any or all of the provisions of Section 202 of this **Order** in any specific contract, subcontract, or purchase **order**.

Add. 4

b.      The Secretary of Labor may, by rule or regulation, exempt certain classes of contracts, subcontracts, or purchase orders (1) whenever work is to be or has been performed outside the United States and no recruitment of workers within the limits of the United States is involved; (2) for standard commercial supplies or raw materials; (3) involving less than specified amounts of money or specified numbers of workers; or (4) to the extent that they involve subcontracts below a specified tier.

c.      Section 202 of this **Order** shall not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities. Such contractors and subcontractors are not exempted or excused from complying with the other requirements contained in this **Order**.

d.      The Secretary of Labor may also provide, by rule, regulation, or order, for the exemption of facilities of a contractor that are in all respects separate and distinct from activities of the contractor related to the performance of the contract: provided, that such an exemption will not interfere with or impede the effectuation of the purposes of this **Order**: and provided further, that in the absence of such an exemption all facilities shall be covered by the provisions of this **Order**.''

[Sec. 204 amended by EO 13279 of Dec. 16, 2002, 67 FR 77141, 3 CFR, 2002 Comp., p. 77141 - 77144]

## Subpart C—Powers and Duties of the Secretary of Labor and the Contracting Agencies

**SEC. 205.** The Secretary of Labor shall be responsible for securing compliance by all Government contractors and subcontractors with this Order and any implementing rules or regulations. All contracting agencies shall comply with the terms of this Order and any implementing rules, regulations, or orders of the Secretary of Labor. Contracting agencies shall cooperate with the Secretary of Labor and shall furnish such information and assistance as the Secretary may require.

[Sec. 205 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 206.**

a.     The Secretary of Labor may investigate the employment practices of any Government contractor or subcontractor to determine whether or not the contractual provisions specified in Section 202 of this Order have been violated. Such investigation shall be conducted in accordance with the procedures established by the Secretary of Labor.

b.     The Secretary of Labor may receive and investigate complaints by employees or prospective employees of a Government contractor or subcontractor which allege discrimination contrary to the contractual provisions specified in Section 202 of this Order.

[Sec. 206 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 207.** The Secretary of Labor shall use his/her best efforts, directly and through interested Federal, State, and local agencies, contractors, and all other available instrumentalities to cause any labor union engaged in work under Government contracts or any agency referring workers or providing or supervising apprenticeship or training for or in the course of such work to cooperate in the implementation of the purposes of this Order. The Secretary of Labor shall, in appropriate cases, notify the Equal Employment Opportunity Commission, the Department of Justice, or other appropriate Federal agencies whenever it has reason to believe that the practices of any such labor organization or agency violate Title VI or Title VII of the Civil Rights Act of 1964 or other provision of Federal law.

[Sec. 207 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 208.**

a.     The Secretary of Labor, or any agency, officer, or employee in the executive branch of the Government designated by rule, regulation, or order of the Secretary, may hold such hearings, public or private, as the Secretary may deem advisable for compliance, enforcement, or educational purposes.

b.     The Secretary of Labor may hold, or cause to be held, hearings in accordance with Subsection of this Section prior to imposing, ordering, or recommending the imposition of penalties and sanctions under this Order. No order for debarment of any contractor from further Government contracts

under Section 209(6) shall be made without affording the contractor an
opportunity for a hearing.

## Subpart D—Sanctions and Penalties

**SEC. 209.** In accordance with such rules, regulations, or orders as the
Secretary of Labor may issue or adopt, the Secretary may:

1. Publish, or cause to be published, the names of contractors or unions
   which it has concluded have complied or have failed to comply with
   the provisions of this Order or of the rules, regulations, and orders of
   the Secretary of Labor.

2. Recommend to the Department of Justice that, in cases in which there
   is substantial or material violation or the threat of substantial or
   material violation of the contractual provisions set forth in Section
   202 of this Order, appropriate proceedings be brought to enforce those
   provisions, including the enjoining, within the limitations of
   applicable law, of organizations, individuals, or groups who prevent
   directly or indirectly, or seek to prevent directly or indirectly,
   compliance with the provisions of this Order.

3. Recommend to the Equal Employment Opportunity Commission or
   the Department of Justice that appropriate proceedings be instituted
   under Title VII of the Civil Rights Act of 1964.

4. Recommend to the Department of Justice that criminal proceedings be
   brought for the furnishing of false information to any contracting
   agency or to the Secretary of Labor as the case may be.

5. After consulting with the contracting agency, direct the contracting
   agency to cancel, terminate, suspend, or cause to be cancelled,
   terminated, or suspended, any contract, or any portion or portions
   thereof, for failure of the contractor or subcontractor to comply with
   equal employment opportunity provisions of the contract. Contracts
   may be cancelled, terminated, or suspended absolutely or continuance
   of contracts may be conditioned upon a program for future
   compliance approved by the Secretary of Labor.

6. Provide that any contracting agency shall refrain from entering into
   further contracts, or extensions or other modifications of existing
   contracts, with any noncomplying contractor, until such contractor has

Add. 7

satisfied the Secretary of Labor that such contractor has established and will carry out personnel and employment policies in compliance with the provisions of this Order.

(b)     Pursuant to rules and regulations prescribed by the Secretary of Labor, the Secretary shall make reasonable efforts, within a reasonable time limitation, to secure compliance with the contract provisions of this Order by methods of conference, conciliation, mediation, and persuasion before proceedings shall be instituted under subsection (a)(2) of this Section, or before a contract shall be cancelled or terminated in whole or in part under subsection (a)(5) of this Section.

[Sec. 209 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 210.** Whenever the Secretary of Labor makes a determination under Section 209, the Secretary shall promptly notify the appropriate agency. The agency shall take the action directed by the Secretary and shall report the results of the action it has taken to the Secretary of Labor within such time as the Secretary shall specify. If the contracting agency fails to take the action directed within thirty days, the Secretary may take the action directly.

[Sec. 210 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p 230]

**SEC. 211.** If the Secretary shall so direct, contracting agencies shall not enter into contracts with any bidder or prospective contractor unless the bidder or prospective contractor has satisfactorily complied with the provisions of this Order or submits a program for compliance acceptable to the Secretary of Labor.

[Sec. 211 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 212.** When a contract has been cancelled or terminated under Section 209(a)(5) or a contractor has been debarred from further Government contracts under Section 209(a)(6) of this Order, because of noncompliance with the contract provisions specified in Section 202 of this Order, the Secretary of Labor shall promptly notify the Comptroller General of the United States.

[Sec. 212 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

## Subpart E—Certificates of Merit

**SEC. 213.** The Secretary of Labor may provide for issuance of a United States Government Certificate of Merit to employers or labor unions, or other agencies which are or may hereafter be engaged in work under Government contracts, if the Secretary is satisfied that the personnel and employment practices of the employer, or that the personnel, training, apprenticeship, membership, grievance and representation, upgrading, and other practices and policies of the labor union or other agency conform to the purposes and provisions of this Order.

**SEC. 214.** Any Certificate of Merit may at any time be suspended or revoked by the Secretary of Labor if the holder thereof, in the judgment of the Secretary, has failed to comply with the provisions of this Order.

**SEC. 215.** The Secretary of Labor may provide for the exemption of any employer, labor union, or other agency from any reporting requirements imposed under or pursuant to this Order if such employer, labor union, or other agency has been awarded a Certificate of Merit which has not been suspended or revoked.

## Part III—Nondiscrimination Provisions in Federally Assisted Construction Contracts

**SEC. 301.** Each executive department and agency, which administers a program involving Federal financial assistance shall require as a condition for the approval of any grant, contract, loan, insurance, or guarantee thereunder, which may involve a construction contract, that the applicant for Federal assistance undertake and agree to incorporate, or cause to be incorporated, into all construction contracts paid for in whole or in part with funds obtained from the Federal Government or borrowed on the credit of the Federal Government pursuant to such grant, contract, loan, insurance, or guarantee, or undertaken pursuant to any Federal program involving such grant, contract, loan, insurance, or guarantee, the provisions prescribed for Government contracts by Section 202 of this Order or such modification thereof, preserving in substance the contractor's obligations thereunder, as may be approved by the Secretary of Labor, together with such additional provisions as the Secretary deems appropriate to establish and protect the

Add. 9

interest of the United States in the enforcement of those obligations. Each such applicant shall also undertake and agree (1) to assist and cooperate actively with the Secretary of Labor in obtaining the compliance of contractors and subcontractors with those contract provisions and with the rules, regulations and relevant orders of the Secretary, (2) to obtain and to furnish to the Secretary of Labor such information as the Secretary may require for the supervision of such compliance, (3) to carry out sanctions and penalties for violation of such obligations imposed upon contractors and subcontractors by the Secretary of Labor pursuant to Part II, Subpart D, of this Order, and (4) to refrain from entering into any contract subject to this Order, or extension or other modification of such a contract with a contractor debarred from Government contracts under Part II, Subpart D, of this Order.

[Sec. 301 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

### SEC. 302.

a.      "Construction contract" as used in this Order means any contract for the construction, rehabilitation, alteration, conversion, extension, or repair of buildings, highways, or other improvements to real property.

b.      The provisions of Part II of this Order shall apply to such construction contracts, and for purposes of such application the administering department or agency shall be considered the contracting agency referred to therein.

c.      The term "applicant" as used in this Order means an applicant for Federal assistance or, as determined by agency regulation, other program participant, with respect to whom an application for any grant, contract, loan, insurance, or guarantee is not finally acted upon prior to the effective date of this Part, and it includes such an applicant after he/she becomes a recipient of such Federal assistance.

### SEC. 303.

a.      The Secretary of Labor shall be responsible for obtaining the compliance of such applicants with their undertakings under this Order. Each administering department and agency is directed to cooperate with the Secretary of Labor and to furnish the Secretary such information and assistance as the Secretary may require in the performance of the Secretary's functions under this Order.

b.      In the event an applicant fails and refuses to comply with the applicant's undertakings pursuant to this Order, the Secretary of Labor may, after consulting with the administering department or agency, take any or all of the following actions: (1) direct any administering department or agency to cancel, terminate, or suspend in whole or in part the agreement, contract or other arrangement with such applicant with respect to which the failure or refusal occurred; (2) direct any administering department or agency to refrain from extending any further assistance to the applicant under the program with respect to which the failure or refusal occurred until satisfactory assurance of future compliance has been received by the Secretary of Labor from such applicant; and (3) refer the case to the Department of Justice or the Equal Employment Opportunity Commission for appropriate law enforcement or other proceedings.

c.      In no case shall action be taken with respect to an applicant pursuant to clause (1) or (2) of subsection (b) without notice and opportunity for hearing.

[Sec. 303 amended by EO 12086 of Oct. 5, 1978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 304.** Any executive department or agency which imposes by rule, regulation, or order requirements of nondiscrimination in employment, other than requirements imposed pursuant to this Order, may delegate to the Secretary of Labor by agreement such responsibilities with respect to compliance standards, reports, and procedures as would tend to bring the administration of such requirements into conformity with the administration of requirements imposed under this Order: Provided, That actions to effect compliance by recipients of Federal financial assistance with requirements imposed pursuant to Title VI of the Civil Rights Act of 1964 shall be taken in conformity with the procedures and limitations prescribed in Section 602 thereof and the regulations of the administering department or agency issued thereunder.

**Part IV—Miscellaneous**

**SEC. 401.** The Secretary of Labor may delegate to any officer, agency, or employee in the Executive branch of the Government, any function or duty of the Secretary under Parts II and III of this Order.

[Sec. 401 amended by EO 12086 of Oct. 5, l978, 43 FR 46501, 3 CFR, 1978 Comp., p. 230]

**SEC. 402.** The Secretary of Labor shall provide administrative support for the execution of the program known as the "Plans for Progress."

**SEC. 403.**

a.      Executive Orders Nos. 10590 (January 19, 1955), 10722 (August 5, 1957), 10925 (March 6, 1961), 11114 (June 22, 1963), and 11162 (July 28, 1964), are hereby superseded and the President's Committee on Equal Employment Opportunity established by Executive Order No. 10925 is hereby abolished. All records and property in the custody of the Committee shall be transferred to the Office of Personnel Management and the Secretary of Labor, as appropriate.

b.      Nothing in this Order shall be deemed to relieve any person of any obligation assumed or imposed under or pursuant to any Executive Order superseded by this Order. All rules, regulations, orders, instructions, designations, and other directives issued by the President's Committee on Equal Employment Opportunity and those issued by the heads of various departments or agencies under or pursuant to any of the Executive orders superseded by this Order, shall, to the extent that they are not inconsistent with this Order, remain in full force and effect unless and until revoked or superseded by appropriate authority. References in such directives to provisions of the superseded orders shall be deemed to be references to the comparable provisions of this Order.

[Sec. 403 amended by EO 12107 of Dec. 28, 1978, 44 FR 1055, 3 CFR, 1978 Comp., p, 264]

**SEC. 404.** The General Services Administration shall take appropriate action to revise the standard Government contract forms to accord with the provisions of this Order and of the rules and regulations of the Secretary of Labor.

**SEC. 405.** This Order shall become effective thirty days after the date of this Order.

## II.   Section 503 of the Rehabilitation Act, 29 U.S.C. § 793

### § 793. Employment under Federal contracts

(a) Amount of contracts or subcontracts; provision for employment and advancement of qualified individuals with disabilities; regulations

> Any contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services (including construction) for the United States shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities. The provisions of this section shall apply to any subcontract in excess of $10,000 entered into by a prime contractor in carrying out any contract for the procurement of personal property and nonpersonal services (including construction) for the United States. The President shall implement the provisions of this section by promulgating regulations within ninety days after September 26, 1973.

(b) Administrative enforcement; complaints; investigations; departmental action

> If any individual with a disability believes any contractor has failed or refused to comply with the provisions of a contract with the United States, relating to employment of individuals with disabilities, such individual may file a complaint with the Department of Labor. The Department shall promptly investigate such complaint and shall take such action thereon as the facts and circumstances warrant, consistent with the terms of such contract and the laws and regulations applicable thereto.

(c) Waiver by President; national interest special circumstances for waiver of particular agreements; waiver by Secretary of Labor of affirmative action requirements

> **(1)** The requirements of this section may be waived, in whole or in part, by the President with respect to a particular contract or subcontract, in accordance with guidelines set forth in regulations which the President shall prescribe, when the President determines that special circumstances in the national interest so require and states in writing the reasons for such determination.

> **(2)(A)** The Secretary of Labor may waive the requirements of the affirmative action clause required by regulations promulgated under

Add. 13

subsection (a) of this section with respect to any of a prime contractor's or subcontractor's facilities that are found to be in all respects separate and distinct from activities of the prime contractor or subcontractor related to the performance of the contract or subcontract, if the Secretary of Labor also finds that such a waiver will not interfere with or impede the effectuation of this chapter.

**(B)** Such waivers shall be considered only upon the request of the contractor or subcontractor. The Secretary of Labor shall promulgate regulations that set forth the standards used for granting such a waiver.

(d) Standards used in determining violation of section

The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 *et seq.*) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201-12204 and 12210), as such sections relate to employment.

(e) Avoidance of duplicative efforts and inconsistencies

The Secretary shall develop procedures to ensure that administrative complaints filed under this section and under the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 *et seq.*] are dealt with in a manner that avoids duplication of effort and prevents imposition of inconsistent or conflicting standards for the same requirements under this section and the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 *et seq.*].

## III.    Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 4212

### § 4212. Veterans' employment emphasis under Federal contracts

**(a)(1)** Any contract in the amount of $100,000 or more entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction) for the United States, shall contain a provision requiring that the party contracting with the United States take affirmative action to employ and advance in employment qualified covered veterans. This section applies to any subcontract in the amount of $100,000 or

more entered into by a prime contractor in carrying out any such contract.

(**2**) In addition to requiring affirmative action to employ such qualified covered veterans under such contracts and subcontracts and in order to promote the implementation of such requirement, the Secretary of Labor shall prescribe regulations requiring that—

(**A**) each such contractor for each such contract shall immediately list all of its employment openings with the appropriate employment service delivery system (as defined in section 4101(7) of this title), and may also list such openings with one-stop career centers under the Workforce Investment Act of 1998, other appropriate service delivery points, or America's Job Bank (or any additional or subsequent national electronic job bank established by the Department of Labor), except that the contractor may exclude openings for executive and senior management positions and positions which are to be filled from within the contractor's organization and positions lasting three days or less;

(**B**) each such employment service delivery system shall give such qualified covered veterans priority in referral to such employment openings; and

(**C**) each such employment service delivery system shall provide a list of such employment openings to States, political subdivisions of States, or any private entities or organizations under contract to carry out employment, training, and placement services under chapter 41 of this title.

(**3**) In this section:

(**A**) The term "covered veteran" means any of the following veterans:

(**i**) Disabled veterans.

(**ii**) Veterans who served on active duty in the Armed Forces during a war or in a campaign or expedition for which a campaign badge has been authorized.

(**iii**) Veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces service medal was awarded pursuant to Executive Order No. 12985 (61 Fed. Reg. 1209).

(**iv**) Recently separated veterans.

**(B)** The term "qualified", with respect to an employment position, means having the ability to perform the essential functions of the position with or without reasonable accommodation for an individual with a disability.

**(b)** If any veteran covered by the first sentence of subsection (a) believes any contractor of the United States has failed to comply or refuses to comply with the provisions of the contractor's contract relating to the employment of veterans, the veteran may file a complaint with the Secretary of Labor, who shall promptly investigate such complaint and take appropriate action in accordance with the terms of the contract and applicable laws and regulations.

**(c)** The Secretary of Labor shall include as part of the annual report required by section 4107(c) of this title the number of complaints filed pursuant to subsection (b) of this section, the actions taken thereon and the resolutions thereof. Such report shall also include the number of contractors listing employment openings, the nature, types, and number of positions listed and the number of veterans receiving priority pursuant to subsection (a)(2)(B).

**(d)(1)** Each contractor to whom subsection (a) applies shall, in accordance with regulations which the Secretary of Labor shall prescribe, report at least annually to the Secretary of Labor on—

**(A)** the number of employees in the workforce of such contractor, by job category and hiring location, and the number of such employees, by job category and hiring location, who are qualified covered veterans;

**(B)** the total number of new employees hired by the contractor during the period covered by the report and the number of such employees who are qualified covered veterans; and

**(C)** the maximum number and the minimum number of employees of such contractor during the period covered by the report.

**(2)** The Secretary of Labor shall ensure that the administration of the reporting requirement under paragraph (1) is coordinated with respect to any requirement for the contractor to make any other report to the Secretary of Labor.

**(3)** The Secretary of Labor shall establish and maintain an Internet website on which the Secretary of Labor shall publicly disclose the information reported to the Secretary of Labor by contractors under paragraph (1).

### IV.   OPM Subcontractor Definition, 48 C.F.R. § 1602.170-15

**1602.170-15 Subcontractor.**

Subcontractor means any supplier, distributor, vendor, or firm that furnishes supplies or services to or for a prime contractor or another subcontractor, except for providers of direct medical services or supplies pursuant to the Carrier's health benefits plan.

### V.   FAR Subcontractor Definition, 48 C.F.R. § 22.801

**22.801 Definitions.**

As used in this subpart—

Subcontract means any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee)—

(1) For the purchase, sale, or use of personal property or nonpersonal services that, in whole or in part, are necessary to the performance of any one or more contracts; or

(2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken, or assumed.

### VI.   Executive Order 11246 Regulation Subcontractor Definition, 41 C.F.R. § 60-1.3

**§ 60–1.3 Definitions.**

Subcontract means any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee):

(1) For the purchase, sale or use of personal property or nonpersonal services which, in whole or in part, is necessary to the performance of any one or more contracts; or

(2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken or assumed.

## VII.   VEVRAA Regulation Subcontractor Definition, 41 C.F.R. §60-250.2(*l*)

For the purpose of this part:

(*l*) Subcontract means any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee):

> (1) For the purchase, sale or use of personal property or nonpersonal services (including construction) which, in whole or in part, is necessary to the performance of any one or more contracts; or

> (2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken, or assumed.

## VIII.   Rehabilitation Act Regulation Subcontractor Definition, 41 C.F.R. § 60-741.2(*l*)

(*l*) Subcontract means any agreement or arrangement between a contractor and any person (in which the parties do not stand in the relationship of an employer and an employee):

> (1) For the purchase, sale or use of personal property or nonpersonal services (including construction) which, in whole or in part, is necessary to the performance of any one or more contracts; or

> (2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken, or assumed.

## IX.   Title VII, 42 U.S.C. § 2000e-2(j)

(j) Preferential treatment not to be granted on account of existing number or percentage imbalance

> Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to,

or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

## X.  Property Act, 40 U.S.C. §§ 101, 121, 122

### § 101. Purpose

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

**(1)** Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

### § 121. Administrative

**(a) Policies prescribed by the President.**—The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

**(b) Accounting principles and standards.**—

**(1) Prescription.**—The Comptroller General, after considering the needs and requirements of executive agencies, shall prescribe principles and standards of accounting for property.

**(2) Property accounting systems.**—The Comptroller General shall cooperate with the Administrator of General Services and with executive agencies in the development of property accounting systems and approve the systems when they are adequate and in conformity with prescribed principles and standards.

**(3) Compliance review.**—From time to time the Comptroller General shall examine the property accounting systems established by executive agencies to determine the extent of compliance with prescribed principles and standards and approved systems. The Comptroller General shall report to Congress any

failure to comply with the principles and standards or to adequately account for property.

### § 122. Prohibition on sex discrimination

**(a) Prohibition.**—With respect to a program or activity carried on or receiving federal assistance under this subtitle, an individual may not be excluded from participation, denied benefits, or otherwise discriminated against based on sex.

**(b) Enforcement.**—Subsection (a) shall be enforced through agency provisions and rules similar to those already established with respect to racial and other discrimination under title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq*.). However, this remedy is not exclusive and does not prejudice or remove any other legal remedies available to an individual alleging discrimination.